[No. D048497. Fourth Dist., Div. One. May 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM PETER NEW, Defendant and Appellant.

**COUNSEL**

R. Clayton Seaman, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Appellant William Peter New appeals from his convictions on two counts of murder. A jury convicted New of murder in the first degree for the killing of his first wife in 1973, and murder in the first degree for the killing of his third wife in 2004. Both women were shot in the head in the homes they shared with New.

In 1973, New admitted that he shot his first wife in the living room of their home in San Bernardino, but claimed that the gun had discharged when he dropped it while cleaning it. San Bernardino police concluded that the death was accidental. In 2004, New's third wife was murdered in the couple's home in San Diego. New claimed that he had gone out in the middle of the night to purchase medicine for his wife, and that when he returned, he found the front door open and his wife dead in their bed. New became a suspect in the shooting death of his third wife, which in turn led police to reopen the investigation of the death of New's first wife.

In 2005, prosecutors charged New with murdering both women. New moved to have the 1973 murder count dismissed on the ground that he had been unfairly prejudiced by the prosecution's lengthy delay in charging him with the crime. Alternatively, New sought to have the two murder counts tried separately. The court denied New's requests. New was tried and convicted on both counts.

On appeal, New contends that the trial court should have dismissed the murder charge pertaining to the 1973 shooting death of his first wife. He argues that he was unduly prejudiced because nearly all of the physical evidence had been lost in the intervening time, because two important witnesses—a coroner who was present at the scene and the medical examiner who performed the autopsy—had died, and because other witnesses could not be located.

New also contends that, even if the trial court did not err in refusing to dismiss the 1973 murder count, the court abused its discretion in denying New's request to sever the two murder counts for trial. New complains that he was prejudiced by joinder of the two counts because evidence from the 1973 killing was not cross-admissible in the 2004 murder case, and the joinder improperly permitted the jury to consider the evidence from the two crimes to convict him of both.

We conclude that the trial court did not err in denying New's motion to dismiss the 1973 murder count. Although New was prejudiced by the delay in prosecuting that charge, the justification for the preaccusation delay outweighs the prejudice to New caused by the delay.

With respect to New's motion for severance, the trial court reasonably denied New's motion to sever the counts for trial, since the evidence as to each count would have been cross-admissible in separate trials. We therefore affirm the judgment of the trial court.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *Factual background*

New was charged with the 1973 murder of his first wife, Somsri,[1] and the 2004 murder of his third wife, Phyllis. The trial lasted approximately two and a half weeks, involved testimony from well over 50 witnesses, and resulted in a lengthy and complex record. In setting forth the factual background, we present a summary of the relevant facts drawn from the evidence presented at trial.

##### 1. *Phyllis's death*

New and Phyllis, New's third wife, had been married for approximately 14 years before Phyllis's death. At just after 4:00 a.m. on October 15, 2004, San

---

[1] We refer to Phyllis New and Somsri New by their first names for purposes of clarity.

Diego County deputy sheriffs arrived at New's mobilehome in Santee after having received a call about a burglary and a possible victim inside the home. New was standing outside the mobilehome when deputies arrived. Deputies entered the home and found Phyllis lying in the bed, motionless, on her stomach. Her body was underneath the bed covers, which were pulled up to her neck. There was a raised red lump near the center of the back of her head, and blood from her nose and ear had soaked the pillow. Deputies noticed that the edges of the bloodstain appeared to have started to dry, as if the blood had been there for a while. Phyllis had no pulse, and her neck was cold to the touch.

Paramedics who were called to the scene checked for postmortem lividity.[2] They noted blotchiness and a line that indicated lividity along the left side of Phyllis's back, her left hip/buttock area, and her left lower thigh area. There was mottling, which is indicative of lividity, on Phyllis's face and back. A paramedic checked Phyllis's jaw and found it somewhat stiff. Her jaw was not completely immovable, but it took "some force to try to move it." The paramedics concluded that Phyllis was beyond resuscitation. They believed that Phyllis had been dead for at least two hours. The paramedics declared Phyllis dead at 4:10 a.m.

Deputies testified that the bedroom in which Phyllis was found appeared to have been slightly ransacked. Only the top drawers of the bedroom's dressers were open, and the contents of those drawers remained folded. It appeared that someone had lifted the drawers' contents and dropped them back into the drawers. The drawers of a large jewelry cabinet had been pulled out and were left stacked and leaning against the cabinet. Jewelry was scattered on the floor. A bedroom window was open and the screen was missing. No other rooms in the residence appeared to have been disturbed. According to one of the deputies, rooms that have been burglarized generally look much worse than the room in which Phyllis was found.

Deputies McEvoy and Turtzer examined the outside of the residence near the bedroom window. According to the deputies, the grass was wet and had not been disturbed. There were no detectable footprints on the concrete sidewalk under the window. An upside-down bucket under the window was covered in a fine layer of dirt that did not appear to have been disturbed. A fully intact screen was resting on top of a nearby garbage can. The window-sill of the open window was covered in a fine layer of dirt that did not appear to have been disturbed.[3]

---

[2] "Postmortem lividity" or "livor mortis" was described at trial as "the discoloration of the skin due to pooling of the blood."

[3] Detectives who investigated the scene later noticed that there was no mud or dirt on the carpet between the open window and the bed.

Deputy McEvoy went back inside the residence and photographed the scene. Phyllis was still lying face down, but the blankets had been pulled down to her waist. The bed showed no sign of a struggle. As McEvoy attempted to retrieve Phyllis's identification from her purse, which was hanging from the doorknob on the inside of the bedroom door, he noticed that her purse contained a silver digital camera.

Lance Martini, a criminalist with the San Diego County Sheriff's crime lab, noticed a large amount of unburned gunpowder on the bedding and on the headboard near Phyllis. The bullet that killed Phyllis was .22-caliber. Martini was unable to find a manufacturer that produces .22-caliber bullets that use the amount of cylindrical gunpowder found at the scene.

Deputy Sakamoto asked New what had happened. New told the deputy that Phyllis had awakened him during the night complaining of a migraine. She asked New to go out to purchase some Excedrin PM for her. New told Sakamoto that he drove to a 24-hour drugstore in El Cajon and purchased the medicine. New did not remember what time he had left to do the errand, but said that it took him approximately 30 minutes to return home. When he arrived home, he found the front door of the mobilehome wide open. New went inside and took the medicine into the kitchen before he went to the bedroom. When he went into the bedroom, he saw the open drawers. New then walked over to the bed, rolled Phyllis over, and saw blood.[4] New went to the kitchen to get a cordless telephone and called 911.

New sat in Sakamoto's patrol car until after the paramedics had left and Sakamoto finished his shift. During that time, New appeared shocked and bewildered. He asked several times for information about whether the paramedics had taken his wife and how she was doing.

Detective Gardener saw a package of Excedrin Migraine medication, and a receipt for the medication, in the kitchen. The receipt showed that the medicine had been purchased at 3:49 a.m. on October 15, 2004. The detective also saw a set of keys and a pair of New's sandals in the kitchen.

New was eventually taken to the police station for questioning. New's clothes were processed by evidence technicians. New did not ask about Phyllis during the three-hour interview. Further, New did not correct the investigators' misconception, based on information New had provided earlier, that his first wife had died in an automobile accident.[5]

---

[4] A detective testified that Phyllis's body had not been turned over after she was shot.

[5] New's second wife eventually provided information regarding the actual circumstances of Somsri's death.

San Diego County Deputy Medical Examiner Steven Campman was called to the scene to examine Phyllis's body at approximately 5:00 p.m. on October 15. He noticed small black specks of gunpowder on the back of Phyllis's head and neck, and also on the bed and headboard near her. By the time Campman examined Phyllis's body, there was a dried rivulet of blood emanating from the wound. Rigor mortis had set in in her arms, legs, jaw and neck. Campman testified that rigor mortis in the jaw usually begins between two to four hours after death. Campman testified that Phyllis's body also showed signs of livor mortis in that her blood had begun to pool and turn a red color in parts of her body. According to Campman, lividity usually becomes visible and fixed in a body between eight to 12 hours after death.

Campman noticed that blood had run from Phyllis's mouth and nose onto the pillow below her head. The blood on the pillow and sheets was dry around the edges and tacky in the center. Generally, blood has this consistency between 12 and 13 hours after death.

During the autopsy, Campman noticed stippling around the gunshot wound to Phyllis's right occipital area. There was also a large amount of unburned gunpowder around the wound. The bullet had created a hole through the skull, traveled through the brain to the frontal lobes, and lodged in Phyllis's left frontal lobe over her left eye socket. Based on the stippling around the wound, Campman opined that the bullet had been fired from an intermediate range, i.e., anywhere from an inch to two or three feet away.

Based on the degree of rigor mortis and lividity in Phyllis's body when he examined it at the scene, and on his observations during the autopsy, Campman concluded that Phyllis had died sometime prior to 3:00 a.m. on October 15, 2004.

Vincent DiMaio, chief medical examiner for Bexar County, Texas, reviewed the reports of police officers and paramedics regarding their observations of Phyllis's body. Based on the observations pertaining to the level of rigor mortis, body temperature, and livor mortis, DiMaio believed that the time of death was approximately two or three hours prior to the time paramedics checked Phyllis at 4:10 a.m. DiMaio's interpretation of the stippling around the gunshot wound was that the bullet had been fired from within two inches of Phyllis's head. DiMaio surmised that much of the unburned gunpowder around the wound was a result of the use of a .22-caliber bullet in a short-barreled gun. DiMaio explained that a .22-caliber bullet is meant to be fired from a gun with a long barrel, such as a rifle. With a rifle, the gunpowder would be consumed in the long barrel. However, because the bullet had been fired from a shorter barreled weapon, the gunpowder was not completely consumed.

A neighbor and coworker of Phyllis's, Carol Espinoza, testified that Phyllis had been worried about New not having a job. The night before Phyllis was killed, Phyllis had come to Espinoza's home and told Espinoza that she had contacted the company where New was supposed to be working. She was told that New no longer worked there. Phyllis was upset. She told Espinoza that she had told New what she had learned, and also told him that she was planning to follow him to work the next morning.

Phyllis had recently made similar complaints about New to others. Sometime within the six months before she was killed, she had told her friend, Richard Custin, that she was upset because she and New were having financial difficulties. A friend of New and Phyllis's, Michael Hunter, also testified about the couple's financial difficulties. Four months before Phyllis was killed, New told Hunter that he was not writing checks because there was no money in his account. Other witnesses similarly testified that there was financial strain in the News' relationship.

Mary Goucher testified that she had been a friend of both New and Phyllis. New telephoned Goucher approximately twice a week after he was arrested for Phyllis's murder. New also sent Goucher letters. During the telephone calls and in his letters, New told Goucher that he loved her. Goucher testified that she had never been intimate with New.

Anthi George testified that she had been a friend of New's when they were teenagers, but that they had lost touch for 40 years. In September 2004, George found New's name on an Internet site and sent him an e-mail. George was living in Scottsdale, Arizona at the time. New eventually responded to George and the two began calling each other on the telephone. George told New that she was divorced, and New told George that he was not married. A few weeks before October 14, 2004, New and George talked about New's intention to travel to Phoenix to see his father. New made plans to meet George in Phoenix on October 15. On October 16, New called George and told her that he was married and that his wife had been murdered the previous night. George continued to communicate with New after New's arrest.

Los Angeles County Sheriff's Investigator Edward Huffman testified about an investigation in which he participated before he retired in 2000. The case involved Marc Jacobi, who was Phyllis's son and New's stepson-to-be at the time. Jacobi had shot and killed a playmate with a rifle in New's home. Huffman saw four rifles, ammunition and holsters in the home. New admitted to Huffman that he owned the guns and the ammunition.

New did not testify in his defense. New called Brian Burnett, an expert in gunshot residue analysis, to testify regarding his analysis of another criminalist's evaluation of New's keys. Burnett opined that although the criminalist had found "lots of lead" on New's keys, this did not necessarily mean that there had been gunshot residue on New's keys. Burnett had done research on particles generally found on keys. He noted that gunshot residue contains lead, antimony, and barium, and said that there would have been more particles of the other types of primer materials, along with the lead, if the substance on New's keys was gunshot residue. Burnett opined that the lead found on New's keys had come from the keys themselves, and not from gunshot residue. Burnett did not actually examine New's keys, or the evidence taken from them.

### 2. Somsri's death

At approximately 8:00 p.m. on September 9, 1973, San Bernardino Police officers and detectives were dispatched to New's residence in San Bernardino to investigate a shooting. New and a woman were standing outside the residence and met Officer Robert Martinez when he arrived. Martinez and Detective Gary Hilder thought that New appeared to be upset, nervous and distraught. When Martinez entered the residence, he saw Somsri lying on a loveseat in the living room. He also noticed a rifle on the living room floor.

Martinez walked over to Somsri and touched her to determine whether she had a pulse. He did not detect a pulse. Martinez noticed a wound on the left top part of Somsri's head. Officers found several gun-related items on the coffee table, including rifle cleaning tools, ammunition, oil, and an operating manual for the rifle, opened to a page that contained a description of the proper way to load and unload a gun. The rifle was covered in oil from the barrel tip to the stock. Officers thought this was unusual; normally, someone who is cleaning a gun would put a light coat of oil on only the metal parts, and would wipe off any excess because too much oil can cause a gun to jam. Three loose bullets on the coffee table were also covered with oil. A police officer opined that a person would generally never put oil on bullets when he or she was cleaning a gun. There was an open box of bullets on the table, from which five bullets were missing. Three were on the coffee table, one remained live in the rifle, and there was one expended cartridge casing in the kitchen. A detective thought it was unusual for a person to handle a firearm with live bullets in it while the firearm was oily. There were no cleaning rods in the vicinity of the rifle on the floor.

Officer Donald Saunders took photographs of the scene on the night of September 9, 1973. Saunders photographed the living room as Somsri lay on the loveseat. He took photographs from the entry looking into the room, and

from every corner of the room. He also took other photographs as directed by detectives. Saunders took photographs in both color and black and white.

Officer Nathan Rushing saw Somsri lying on the loveseat, and saw a significant quantity of brain matter and blood on the east wall behind the loveseat. The left side of Somsri's head above her ear, which was closest to the wall, was missing for the most part. Officers saw an entrance wound on the right side of Somsri's head, behind her right ear.

After Somsri's body was removed, Rushing saw a substantial amount of blood in the corner of the loveseat where Somsri's head had been. He noticed a bullet hole in the back cushion of the loveseat. When the loveseat was pulled away from the wall, Officer Rushing and Detective John Fields saw a hole in the back of the loveseat and a hole in the wall behind the loveseat. Fields believed that the hole in the back of the loveseat was an exit hole because there were cotton fibers protruding from it. Rushing did not see any holes in the pillow on which Somsri's head had been lying, nor did he see any hole in the seat cushion of the loveseat.

Detective Fields took measurements around the bullet hole in the wall. The hole was 19.5 inches above the floor and 58 inches from the northeast corner of the room.

Martinez spoke with New at the scene. New explained that he had been cleaning his rifle while sitting on the sofa in the living room. Somsri was asleep on the loveseat. New told Martinez that while he was cleaning the rifle, he had put bullets into the gun. He said that he was taking the bullets out when the rifle slipped, fell to the ground, and discharged. New told Martinez that he saw blood on Somsri's neck, and that he briefly attempted to administer first aid. After he attempted to administer first aid, he immediately called for an ambulance.

Officer Rushing saw and heard New telling someone how the rifle had accidentally fired. He heard New say several times that he had been sitting on the sofa while cleaning his rifle and running bullets through it when the gun slipped from his hands and discharged as he reached for it. New demonstrated what he said had occurred. When New attempted to pick up the rifle, Rushing told him to leave it on the ground. Based on New's demonstration at the scene, Rushing estimated that the rifle had been between six and 12 inches off the ground when it discharged.

Officer Art Yeakel took measurements of the room and made a diagram of the scene based on those measurements. Yeakel noted the distances between various pieces of furniture and items of evidence, including the gun, the sofa,

the loveseat, an expended cartridge near the refrigerator in the adjoining kitchen, a pool of blood on the floor near the loveseat, and a container with knitting material in it. Yeakel did not measure the distance between the loveseat and the wall. Yeakel believed that his measurements were accurate to within one-half inch.

According to Officer Rushing, detectives and officers did not call anyone to the scene to perform blood splatter interpretations because that technology did not exist in 1973. At the time of the incident, the officers and detectives who investigated the shooting believe that the shooting was accidental.

Detective Hilder spoke with New at the police station later that night. New told Hilder that he had just purchased the rifle, and said that he also owned two handguns. New told Hilder that Somsri had been asleep on the loveseat while New was "working the rifle's action." The rifle slipped from his hands. When he caught it, it discharged in Somsri's direction, and New immediately saw blood all over the wall. New demonstrated for Hilder what had happened. Hilder opined from his recollection of New's demonstration that under New's version of events, the rifle could not have been more than 20 inches off the ground when it discharged. New told Hilder that he had been married to Somsri for three years and that they had not been having any marital problems.

In 2005, San Diego County Sheriff's Department Criminalist Gene Lawrence reviewed the photographs and the police reports from the 1973 shooting to determine whether the evidence was consistent with the statements New had made to police at the time. Lawrence drove to the residence where the shooting occurred to take measurements around the windowsill near the loveseat where Somsri had been shot. The residence had "burned down" sometime between 1973 and 2005, but the "windowsill was still there."[6] Lawrence was able to measure the distance from the floor to the windowsill. Using measurement ratios and evidence from the photographs, Lawrence determined that the top of the seat cushion of the loveseat had been approximately 17 inches from the floor, and that the armrest had been about 20 inches from the floor. He concluded that the top of the back of the loveseat was approximately 32 inches from the floor.

Using a live model who was the same height as Somsri, Lawrence had the model pose on a mockup loveseat in the same position as Somsri's body appeared in the photographs of the scene. He compared the position of the model with the position of a bullet hole in a wall 19.5 inches from the floor,

---

[6] Lawrence did not know whether the windows in the house had been removed, and could not say definitively whether the windowsill was in exactly the same position it had been in 1973.

behind the loveseat. Lawrence opined that the height of the entrance wound on Somsri's head as shown in the 1973 photographs was about 24 inches from the floor. Based on this fact, Lawrence concluded that at the time Somsri was shot, she was not in the position in which officers found her at the scene. He noted that the concentration of bloodstains on the wall was higher than the level of Somsri's head in the 1973 photographs. He also noted that Somsri's hair on the left side of her head, against the loveseat cushion, was pulled in an upward direction, which indicated that her head had moved downward along the cushion after she was shot.

Lawrence opined that the blood splatter on the wall was caused by the bullet entering Somsri's head, rather than exiting, because there was no brain matter mixed with the blood splatter. The blood and brain matter found on the loveseat was caused by the bullet exiting Somsri's head. After considering all of this, Lawrence believed that Somsri's head was at least 30 inches above the floor at the time she was shot. He concluded that the physical evidence was not consistent with New's statements to police about how the shooting occurred.

Crime scene reconstructionist Robert Stites used computer enhancement tools to measure the distances and dimensions depicted in the photographs. He concluded that the height of the back of the loveseat was 34 inches above the floor, and that the seat cushion of the loveseat had been 19 inches above the floor. Based on his calculations, Stites determined that the bullet hole in the back of the loveseat was 26 inches above the floor, and that the loveseat had been 18 inches from the wall when Somsri was shot.

Rod Englert, another crime scene reconstructionist, believed that the physical evidence from the scene of Somsri's killing was not consistent with New's statements that New had fumbled with the gun and that it had accidentally discharged. Englert noted that the measurements of the bullet holes did not match up with the position in which Somsri's body was found, nor with a shot having been fired from six feet away with the muzzle of the rifle no more than a foot from the ground, as New had described. Englert also commented that Somsri could not have been shot while in the position she was found in because in the photographs, Somsri's head was lying on the entry wound, so that the entry wound was nearly covered by the pillow.

Lance Martini used information Lawrence provided to perform calculations regarding the trajectory of the bullet. According to Martini, factors such as gravity and bullet deflection due to ricocheting are generally not very significant over short distances. Martini concluded that the bullet would likely have traveled on a fairly straight path. Martini calculated the approximate angles from which Somsri would have had to have been shot, given varying

distances between the gun, the loveseat, the wall, and Somsri's head. He concluded that the closer Somsri's head was to the wall, the steeper the bullet angle would have had to have been.

Martini also commented on the safety features of the Ruger rifle. According to Martini, Ruger rifles are test fired before they are sold. Martini noted that this type of gun has several internal safety mechanisms, and that the only way the firearm will discharge is if the trigger is pulled while the safety mechanism is in the "off" position. If for some reason a gun like this did go off as a result of being dropped, "the damage to the rifle and the mechanism would be so catastrophic you might get one discharge, but that would be it." Martini also noted that the Ruger rifle New owned in 1973 had never been recalled by the manufacturer for defects.

Martini testified that having excess oil on and inside the Ruger would have caused problems operating the gun, and noted that the gun manual recommended not using excessive oil on the gun. In particular, excessive oil in the barrel of the rifle could obstruct the bullet and could "result in catastrophic failure should live ammunition be fired . . . ." Additionally, there is no reason to oil the wood parts of a gun like the Ruger; doing so would discolor and warp the wood, "potentially causing a problem."

Based on the coroner's report, Martini believed that the barrel of the gun was either next to Somsri's skin or a half-inch away when she was shot. Martini explained that the characteristics of a wound such as Somsri's are typically caused by a contact or close distance discharge. According to Martini, the absence of stippling is characteristic of close proximity discharges, because the gunpowder particles would be driven into the wound. There would not have been time for the particles to spread out and impact the surface of the skin. Martini also said that Somsri's dark hair would have "block[ed] the disposition of the soot from reaching the scalp," and may have hidden the soot, because the dark soot matched Somsri's black hair. This, in combination with bleeding, would make detecting any soot difficult. Martini admitted that he could not rule out the possibility that a high-powered rifle, shot from six feet away, could have created the type of stellate laceration found on Somsri's head.

DiMaio, the Bexar County, Texas, medical examiner, also reviewed the autopsy report and examined the photographs that were taken at the scene. He opined that Somsri had sustained a contact wound from a .44-magnum bullet. He based this opinion on information contained in the autopsy report, including the descriptions of the 12-centimeter stellate entrance wound and the large exit wound. According to DiMaio: "[T]he stellate wounds are typically seen in the head from contact wounds, which is when the muzzle of

the gun is against the head. The bullet goes out the muzzle and produces a round hole approximately 10 to 12 millimeters in diameter. And right behind the bullet comes gas at about 20- to 25- to 30,000 pounds per square inch of pressure, follow[ing] the bullet through the hole. [¶] The bullet enters a hole through the skin. The gas tries to get through. What happens is the gas starts to diffuse. And the fuse is between the scalp and the bone because it can't all get through that hole. And when it does, it kind of, you know, dissects and then balloons out the skin. And it balloons out such that it exceeds the elastic capability of the skin to absorb stretching. It tears. So you get tears, and you get, basically, a stellate wound from contact wounds."

DiMaio acknowledged that it is theoretically possible for a stellate wound to form from a distance wound, but that this usually "doesn't happen." In such a case, the wound would be much smaller than the 12-centimeter wound found on Somsri's head.

DiMaio also considered the type of ammunition that was used in explaining why the injury looked the way it did. He noted that the bullet was a pistol cartridge rather than a rifle cartridge, and that it therefore traveled with less velocity than a rifle bullet would have traveled. "[T]he kinetic energy—the energy that the bullets ha[ve] to wound is dependent on two factors. One is weight, and the other one is the velocity." DiMaio opined that because a pistol cartridge was used, damage of the kind that was found on Somsri's head would not have been seen unless the gun had been placed immediately next to Somsri's head and fired.

When asked whether the lack of soot found around the wound altered his opinion that the wound was a contact wound, DiMaio explained that it did not, because the ammunition was designed to be fired from a handgun with a much shorter barrel. Since the bullet had to travel down an 18-inch barrel, any soot would likely have been deposited along the length of the barrel, with very little or no soot exiting the barrel. Further, any soot that may have exited would likely have been "washed away in the blood." DiMaio further opined that at the time Somsri was shot, her head could not have been in the position it was when police first saw her, because the entry wound was covered by the pillow, and there was no damage to the pillow.

New did not testify. The defense presented Patricia Lough, a criminalist who had retired from the San Diego Police crime laboratory. Lough testified that she was being sued by Rod Englert. Lough had observed Englert's testimony in an earlier case, and had then visited the crime scene in that case herself. Based on her observations, Lough believed that Englert's interpretations and observations were incorrect in a number of significant respects. Lough notified the deputy district attorney of errors she perceived in

Englert's analysis. However, the prosecutor chose to use Englert's interpretations rather than those of the crime lab team. After trial, Lough filed an ethics complaint against Englert with the American Academy of Forensic Sciences. As a result of Lough's complaint, Englert was required to alter some portion of his resume and submit it to the academy for approval, if he wanted to remain a member. Lough had not been given any information regarding the specifics of this case, and did not testify as to the particular circumstances or evidence of Somsri's death.

## B. *Procedural background*

On August 17, 2005, New was charged in an amended information with the murder of Phyllis (Pen. Code, § 187, subd. (a)) (count 1) and the murder of Somsri (§ 187, subd. (a)) (count 2). The information further alleged that New personally discharged a firearm in murdering Phyllis (Pen. Code, § 12022.53, subd. (d)), and that he personally used a firearm in murdering Somsri (Pen. Code, § 12022.5, subd. (a)).

On October 17, 2005, New filed a motion to dismiss count 2 on the ground that there had been unjustified preaccusation delay in prosecuting the 1973 shooting. New also filed a motion to sever counts 1 and 2. The trial court denied both motions.

On March 16, 2006, a jury convicted New of the first degree murder of Phyllis. The jury also found true the special circumstance that New had committed multiple murders, and the allegation that New personally discharged a firearm in the commission of the offense. The jury also found New guilty of the first degree murder of Somsri, and found true the allegation that New personally used a firearm in the commission of the offense.

On April 13, 2006, the court sentenced New to life without the possibility of parole on count 1, the principal count, plus a consecutive sentence of 25 years to life for the Penal Code section 12022.53, subdivision (d) firearm enhancement related to count 1. The court imposed a sentence of life with the possibility of parole on count 2, to run consecutively to the sentence on count 1, plus a consecutive sentence of five years to life for the Penal Code section 12022.5, subdivision (a) firearm enhancement related to count 2.

New filed a timely notice of appeal on April 18, 2006.

In their respective appellate briefs, the parties focused primarily on the prejudice to New caused by the delay in prosecuting him for the murder of Somsri, in terms of the impact of missing evidence and witnesses, and not on

the justification for the delay. The People stated in their brief that the justification for the delay was "that appellant shooting Somsri was classified as an accidental shooting," and also mentioned advances in forensic science as another reason for the delay. Neither party directly addressed whether the murder of Phyllis in 2004 justified the delay in charging New with the murder of Somsri in 1973. After all briefs had been filed, this court requested that the parties file supplemental briefs addressing the following question: "Is the October 15, 2004 homicide of defendant's third wife a relevant factor in determining whether the prosecution's delay in charging the defendant with the 1973 murder of his first wife was justified?" Both parties submitted supplemental letter briefs.

## III.

## DISCUSSION

### A. *Preaccusation delay*

New contends that the trial court should have granted his motion to dismiss count 2 on the basis that the preaccusation delay was unjustified and prejudicial. According to New, the 32-year delay prejudiced him by hindering his ability to present a defense, and there was "[v]irtually no new evidence" available to the prosecution in 2004 that was not available in 1973.

### 1. *Applicable law*

In *People v. Catlin* (2001) 26 Cal.4th 81 [109 Cal.Rptr.2d 31, 26 P.3d 357] (*Catlin*), the Supreme Court summarized the law applicable to a defendant's claim that preaccusation delay has resulted in a denial of due process. "Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay. [Citations.] A claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant. [Citations.]" (*Catlin, supra,* 26 Cal.4th at p. 107.)

Under this balancing test, the trial court undertakes a delicate weighing of interests to determine whether preaccusation delay has deprived the defendant

of due process: "[A] minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. By the same token, the more reasonable the delay, the more prejudice the defense would have to show to require dismissal." (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 915 [55 Cal.Rptr.2d 404] (*Dunn-Gonzalez*).) The trial court's task "is to determine whether precharging delay violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." (*Id.* at p. 914.)

"Whether prearrest delay is unreasonable and prejudicial to the defendant is a question of fact." (*Dunn-Gonzalez, supra,* 47 Cal.App.4th at pp. 911–912.) "The trial court's ruling must be upheld on appeal if it is supported by substantial evidence. [Citation.]" (*Id.* at p. 912.)

### 2. *Additional background regarding the hearing on New's motion to dismiss*[7]

During the hearing on New's motion to dismiss count 2 and his alternative motion to sever the two murder charges for trial, New asserted that the delay in charging and prosecuting him for the murder of Somsri had prejudiced his ability to present a defense. New's defense theory regarding Somsri's death was that he had been cleaning the gun when he dropped it, and it accidentally fired. New maintained that evidence regarding the trajectory of the bullet was thus particularly important to his defense.

New argued that the delay in charging him with Somsri's murder had caused him prejudice because Dr. Irving Root, who performed the autopsy on Somsri's body, and L.B. Reyes, the coroner on the scene, had both died and were unavailable to testify at his trial. The court noted that New could hire an expert, just as the prosecution had, to testify regarding the physical findings and to attest that the wound Somsri suffered was not a contact wound. Defense counsel insisted that no expert could replace Dr. Root because Dr. Root had performed the autopsy and possessed particularized knowledge of the wound. The trial court observed that Dr. Root might not have testified favorably for the defense, and indeed, that he might have changed his conclusions after "32 years of advancement in forensic sciences" and thousands of subsequent autopsies he performed after the autopsy of Somsri.

The prosecutor noted that Dr. Root's report included his conclusions concerning the distance from which the gun had been fired based on his

---

[7] The trial court ruled on New's motion to dismiss for prejudicial preaccusation delay prior to the commencement of the trial. In ruling on the motion, the court considered evidence that the parties had presented at the preliminary hearing. The evidence that the prosecution presented at the preliminary hearing was substantially similar to the evidence that the prosecution eventually presented at trial.

finding no powder stains, stippling, or tattooing on the scalp, but that Dr. Root had also acknowledged that he could not determine the precise range. The prosecutor also argued that even if the wound was not a contact wound, the evidence was nevertheless inconsistent with New's description of what occurred that night. Thus, to the extent that New was complaining that Dr. Root's death was extremely prejudicial to New's ability to present a defense, even if the jury believed Dr. Root's conclusions regarding the distance from which Somsri was shot, there was other evidence that demonstrated that the shooting still could not have happened the way that New claimed it had. Further, the prosecution offered to stipulate to allow Dr. Root's report in evidence, and also to stipulate that the report evidenced Dr. Root's conclusions.

Defense counsel also complained that autopsy photographs had been "either destroyed, lost, or never taken," that the San Bernardino Police Department had misplaced the rifle involved in the shooting, and that the furniture from the living room, including the loveseat on which Somsri was lying when she was shot, had also been lost. In addition, New complained that the statement he made to police had been lost, that there was no way to locate a neighbor with whom New may have been speaking when officers arrived after the shooting, and that New was unable to present evidence as to the state of New and Somsri's relationship at the time of the shooting because he could not find people who knew them at that time.

The trial court acknowledged that evidence and witnesses had been lost, and that because of this, New "rightly claimed prejudice." However, the court also concluded that the prejudice to New was not of "such a quantity or quality as to result in an unfair trial." In particular, the court disagreed that Dr. Root was "as important a witness as [New's attorney] believe[d] him to be." In addition, although police in San Bernardino apparently had not kept evidence gathered from the scene—most likely because Somsri's death was ruled an accident at the time—the court concluded that the police had not destroyed any evidence that could have had either inculpatory or exculpatory value to New.

The court further determined that the justification for the delay outweighed any harm New may have suffered as a result of the delay. The court concluded that prosecutors would not have been able to present sufficient evidence to support a conviction 30 years earlier, stating that, "the case wasn't there in 1973." The court correctly noted that the events in 2004 had triggered the reopening of the investigation of Somsri's death. "The reason for the delay is, as Mr. Mechals says, as stated and is evident from the state of the case, that San Bernardino in 1973 did have—didn't have a case. They

didn't have a prosecutable case that is defined by the guidelines, the prosecution guidelines that all the District Attorney's offices are supposed to be using. [¶] And they don't issue cases because there is probable cause, they issue cases because they believe that they can establish beyond a reasonable doubt that the person is guilty of the offense. And in 1973, the cops apparently did not think they had enough to take it to the D.A. [¶] . . . [¶] The change in status, the cause for the reevaluation was the 2004 incident involving Phyllis New, and causing a complete reevaluation of the defendant's past behaviors, especially since he had, we may call it a lie of omission or we may just call it a flat-out lie about what the circumstances were of his first wife's death, the accident involving his first wife."

The court concluded that law enforcement officials had not undertaken the long delay in an attempt to gain any tactical advantage, and noted that the delay had also hurt the prosecution's ability to make out a case against New.

3. *The shooting death of Phyllis in 2004 was the pivotal factor in the People's decision to reopen the investigation into the shooting death of Somsri in 1973, and clearly justifies the delay in prosecuting New for Somsri's murder*

While the lengthy delay in prosecuting New resulted in the loss of both physical evidence and witness testimony, and was thus prejudicial to New, there is substantial evidence to support the trial court's ruling that the prejudice did not deprive New of a fair trial and that the justification for the delay outweighed the prejudice to New.

a. *Prejudice*

New asserts that the prejudice he suffered as a result of the lengthy preaccusation delay "materially impinged [his] ability to get a fair trial." New cites a litany of evidence pertaining to the circumstances of Somsri's death that was unavailable because witnesses were dead or missing, certain evidence was never collected, evidence that was collected was missing, and San Bernardino police officers' memories "had been substantially impaired." New identifies a number of specific examples of evidence that had either been lost or was now unavailable, including: (1) L.B. Reyes, the coroner who viewed the scene of the shooting is deceased; (2) Dr. Root, who performed the autopsy on Somsri's body is deceased; (3) the police are unaware whether there were any photographs or audiotapes of Somsri's autopsy; (4) the rifle involved in the shooting could not be located; (5) a number of police reports had been purged; (6) a tape recording of New's 1973 interview was missing; (7) the identity of the woman with whom New was speaking when police

arrived at the scene remains unknown; (8) the names of the paramedics who responded to the scene of the 1973 shooting remain unknown; (9) a detective did not know neighbors' identities, or whether they had been interviewed, did not know whether friends of the News had been identified or interviewed, and was unable to locate Somsri's prior place of employment; (10) the store where New purchased the rifle no longer exists; (11) furniture and physical evidence from the living room could not be found; and (12) no canvassing of the area was undertaken to ascertain whether there were other witnesses. New asserts that the only remaining items of evidence are a bullet fragment, 26 photographs that were taken at the scene, the coroner's report, the autopsy report, and some police reports from the coroner's file.

New challenges the trial court's conclusion that Dr. Root's death was not an irremediable problem for the defense. He contends that the "best means" he had to refute the prosecution's theory that Somsri's wound resulted from a close-range firing of the gun was testimony from Reyes and, more importantly, Dr. Root. However, as the trial court noted, the prosecution stipulated to Dr. Root's medical observations as stated in his report. Thus, New was able to present Dr. Root's observations and conclusions to the jury; the question at trial involved interpreting the meaning of those observations. Although Dr. Root's testimony would certainly have been useful in this regard, his testimony was by no means the only way the defense could have presented evidence that Dr. Root's findings indicated that Somsri was shot from a distance, and not from close range, as the prosecution theorized. The defense could have called an expert to present his or her interpretation of Dr. Root's observations, just as the prosecution did. That expert would have relied on exactly the same evidence that was available to the prosecution's experts. Further, it is not at all clear that Dr. Root would have testified in the manner in which New's attorney assumes he would have. As the trial court noted, Dr. Root handled thousands more autopsies after Somsri's autopsy. In that time, forensic science had improved and Dr. Root's experience had deepened. It is thus not a certainty that Dr. Root would have maintained his position as set forth in his report that Somsri's wound was caused by a bullet fired from a distance. Finally, even if the missing evidence would have corroborated New's version of the distance and angle from which Somsri was shot, this would not have established, as New seems to implicitly suggest, that the shooting was not intentional.

New also suggests that he was unable to question any of the paramedics who arrived at the scene about "any disturbance they caused to the scene." He contends that any movement of Somsri's body or of the loveseat on which she was lying would be "critical to the determination of the projectile trajectory." New raises the possibility that the photographs that were taken at the scene did not accurately depict the location and placement of Somsri's

body when officers arrived at the scene. He complains that he was unfairly hindered in his ability to challenge the prosecution's trajectory theory because he could not ask the paramedics about these issues.

Evidence from the preliminary hearing demonstrated that the testimony of the paramedics would not have been particularly significant. Officer Martinez testified that before entering the home when he first arrived, he asked everyone outside whether anyone had checked to see whether Somsri was still alive. No one indicated that they had, so Martinez entered the residence and carefully walked toward Somsri. He did not move her to check her pulse. Martinez testified that photographs that were later taken at the scene accurately reflected his best recollection of the position of Somsri's body when he first saw her. At least one other officer also testified that the photographs accurately depicted the scene as he had found it.

With regard to physical evidence from the scene that was missing, the prosecution was able to present a loveseat of similar dimensions to the one on which Somsri was lying when she was shot. New could have had experts use this loveseat to demonstrate why the prosecution's calculations concerning the trajectory of the bullet and the distance from which Somsri was shot were wrong. New contends, however, that "cross-examination of reconstructed evidence is NOT the same as the ability to present and develop contrary original evidence." Assuming that this is true, the fact that original physical evidence is unavailable does not necessarily cause prejudice to a defendant to such a degree as to render the trial unfair.

In sum, the record supports the trial court's determination that any prejudice New might have suffered as a result of the delay in accusing him of Somsri's murder would not result in an unfair trial.

### b. *Justification*

There is ample evidentiary support for the conclusion that the prosecution's proffered justification for the lengthy delay in charging New with Somsri's murder was reasonable and substantial enough to permit the case to go forward despite the prejudice New might suffer as a result of the lengthy delay.

In an attempt to demonstrate that the prosecution was not justified in waiting as long as it did to charge New with Somsri's murder, New asserts

that the "justification for the delay was not the advancement of forensic science," but was, rather, "simply the prosecution's unwillingness to proceed at an earlier time."[8]

The record does not support New's assertion concerning the reason for the delay in accusing him of Somsri's murder. It was not simply advancements in forensic science or the prosecution's unwillingness to proceed in 1973 that led prosecutors to reevaluate the circumstances of Somsri's death and to charge New with murdering her. Rather, Phyllis's death in 2004 was the critical factor that caused prosecutors to reexamine the circumstances of Somsri's death. Investigators became suspicious about whether Somsri's death had really been an accident after Phyllis also died as a result of a gunshot wound to the head. The existence of probable cause to arrest New for Somsri's murder was not apparent to detectives until after Phyllis was murdered. Rather than addressing this significant reason for the lengthy delay in charging him with Somsri's murder, New essentially ignores this fact in his briefing, and focuses instead on demonstrating how the missing evidence prejudiced him.

Only after this court requested supplemental briefing from the parties on the issue of the relevance of Phyllis's murder to the justification for the delay in charging New with murdering Somsri did New address this new evidence. In supplemental briefing, New asserts that "there was no causal link between the 2004 investigation in to the death of Phyllis New and the three decade delay in prosecuting the defendant for the death of Somsri New. Nothing of any evidentiary value turned up in the 2004 investigation of Phyllis New's death that was not available to the authorities during the 1973 investigation into the death of Somsri New. Thus, there is no relevant connection between the two."

This claim is not persuasive. The delay in charging New with Somsri's murder is indisputably linked to the 2004 murder of New's third wife, Phyllis. The reopening of the investigation into Somsri's death would not have occurred *but for* Phyllis's murder. Despite New's assertion to the contrary, something of evidentiary value clearly did "turn[] up in the 2004 investigation of Phyllis New's death that was not available . . . during the 1973 investigation" into Somsri's death—another of New's wives was found dead in her home, shot in the back of the head while sleeping. This fact constitutes new evidence that could be used to establish that New did not accidentally shoot Somsri, as he claimed, but rather, that he shot her

---

[8] New concedes that "there was some advancement in forensic science during the intervening three decades." However, New dismisses those advances, suggesting that they had "at best, only minimal effect on the prosecution's ability to proceed."

intentionally. (See *Catlin, supra,* 26 Cal.4th at p. 109 ["By the time defendant was charged, of course, additional evidence of his guilt had emerged—particularly defendant's involvement in the paraquat poisoning of two more persons."].)

■ Although under California law a defendant need not show that the preaccusation delay was undertaken to give the prosecution a tactical advantage, the absence of such evidence is nevertheless relevant in the weighing of the prejudice to the defendant against the justification for the delay. Here, there is no evidence that the delay occurred because the prosecution was attempting to gain a tactical advantage. Phyllis's death and the circumstances surrounding it clearly provided the impetus for San Diego investigators to challenge the earlier conclusion of San Bernardino investigators that Somsri's death was accidental. With evidence of the murder of Phyllis, law enforcement officers were able to gather sufficient evidence to support charging New with murdering Somsri. It is possible that, as New contends, the delay in charging him with Somsri's murder is in part attributable to the fact that the law enforcement officers who conducted the initial investigation into Somsri's death were negligent in failing to detect and/or pursue inconsistencies in New's version of how the shooting occurred, and that a more thorough investigation at that time might have led to charges being filed against New in 1973. However, officers did not know in 1973 that another of New's wives would later die from a gunshot wound to the head. The trial court concluded that, without this information, there was simply not a prosecutable case in 1973. There is substantial evidence to support this conclusion. Further, even if the trial court had concluded that the delay in charging New with Somsri's murder was attributable in part to negligence in conducting the original investigation, there is no question that Phyllis's death in 2004 was a critical factor in the decision to charge New with murdering Somsri. Although a more thorough initial investigation into Somsri's death at the time it occurred would clearly have been preferable for both the prosecution and the defense, the fact that New's third wife was killed under suspicious, and similar, circumstances in 2004, gave investigators reason to reopen the case regarding Somsri's death. Thus, the trial court did not err in concluding that the justification for the delay in charging New with Somsri's murder outweighs any prejudice New may have suffered as a result of inadequate police investigation in 1973.

B. *The trial court did not abuse its discretion in denying New's motion to sever the two murder charges*

New contends, in the alternative, that the trial court erred in denying his motion to sever the two murder counts for trial. In denying the motion to sever, the trial court concluded that there was "evidence that would be

cross-admissible to prove absence of mistake or accident with regard to the 1973 events. Evidence of intent, evidence of motive, all of those things are cross-admissible." The court also determined that neither of the charges would be particularly more inflammatory than the other, and noted that although the joinder of the two counts converted the case into a capital case, the district attorney had "declined to go forward on the death penalty in the case," and would not be permitted to seek the death penalty at a later time. With regard to the relative strengths and weaknesses of the two cases, the trial court concluded, "You know, there certainly are differences [in the] strengths of the cases, but I am not sure that the case in 1973, with the new advancement of [the events of] 2004 that will be admissible as to the 1973 events, make it a weak case. [¶] I mean, it is qualitatively probably weaker than is the 2004 case, but that does not make it a weak case to cause severance. And I don't believe that it is weak enough so that we have a situation of joining a weak with a strong case."

On appeal, New challenges many of the trial court's conclusions. According to New, the joinder of the two charges allowed the relative strength of the case against him for the murder of Phyllis to "spill over" to the weaker case against him for the murder of Somsri. New further contends that the evidence relevant to Somsri's murder would not have been cross-admissible in a separate trial, and that, as a result, joinder of the two murder charges resulted in undue prejudice to him. Finally, New asserts that the trial court's failure to instruct the jury to limit its consideration of the evidence relating to the murders further prejudiced him. According to New, the court should have instructed the jury that it could consider the cross-admissible evidence only for a limited purpose, so as to reduce the potential of a "spill over" effect resulting from the joint trial.

We disagree with New's contentions and conclude that the trial court did not abuse its discretion in denying his motion for severance.

### 1. *Law governing the joinder and severance of criminal charges*

■ Penal Code section 954 permits the joinder of different offenses under certain circumstances: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

In a situation in which the statutory requirements for joinder are satisfied, a defendant seeking severance must make a clear showing in the trial court of

the potential prejudice that could result from joining the charges. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1314–1315 [65 Cal.Rptr.2d 145, 939 P.2d 259] (*Bradford*).) This court reviews a trial court's ruling on a motion to sever for an abuse of discretion. (*Id.* at p. 1315.)

" ' "The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]' [Citations.]" (*Bradford, supra,* 15 Cal.4th at p. 1315.)

However, the aforementioned criteria "are not equally significant." (*Bradford, supra,* 15 Cal.4th at p. 1315.) " '[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others.' " (*Bradford, supra,* 15 Cal.4th at pp. 1315–1316.) If evidence on each of the joined charges would have been admissible in separate trials on the charges, any likelihood of prejudice in the denial of a motion to sever is dispelled. (*People v. Maury* (2003) 30 Cal.4th 342, 393 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

> 2. *The trial court did not abuse its discretion in determining that a joint trial would not prejudice New*

> a. *The evidence of the murders was cross-admissible*

New does not dispute that the statutory requirements for joinder were satisfied. Rather, New asserts that he was presumptively prejudiced by the trial court's denial of his motion to sever because, he claims, evidence of Somsri's murder was not cross-admissible in the trial of Phyllis's murder. We disagree.

"Evidence of crimes committed by a defendant other than those charged is inadmissible to prove criminal disposition or a poor character. '[B]ut evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a

common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (Evid. Code, § 1101.) Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. [Citation.] . . .' [Citation.]" (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123 [12 Cal.Rptr.3d 592, 88 P.3d 498] (*Lenart*).)

"To be relevant to prove identity, the uncharged crime must be highly similar to the charged offenses, while a lesser degree of similarity is required to establish relevance to prove common design or plan, and the least similarity is required to establish relevance to prove intent. [Citations.]" (*Lenart, supra*, 32 Cal.4th at p. 1123.) In addition, evidence of an uncharged crime is admissible only if it has "substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence. [Citations.]" (*Ibid.*)

New argues that the evidence as to counts 1 and 2 was not cross-admissible because evidence of the circumstances surrounding Somsri's death was not admissible to prove identity or common plan or design with regard to Phyllis's death. New fails to acknowledge, however, that evidence regarding Phyllis's death was cross-admissible on the issue of intent, or lack of accident or mistake, with respect to Somsri's death. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*), superseded by statute on other grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505 [128 Cal.Rptr.2d 290].) " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Ewoldt, supra*, 7 Cal.4th at p. 402.)

The circumstances surrounding Phyllis's and Somsri's deaths were similar. Perhaps most significant is the fact that both victims were married to New at the time they were killed. In addition, both Phyllis and Somsri were shot a single time, in the back of the head, from a relatively close distance. Both victims appeared to have been asleep at the time they were shot. At the time each of the victims was killed, New was the beneficiary of the victim's life insurance policy. These facts are sufficient to support an inference that New did not accidentally shoot Somsri, but instead, that he shot her intending

to kill her. The trial court's conclusion that the probative value of this evidence as to New's intent outweighed its prejudicial effect was reasonable.

The cross-admissibility of the evidence in Phyllis's case on the issue of intent in Somsri's case is itself sufficient to justify the joinder of the two counts, even if the evidence in Somsri's case would not have been cross-admissible for any purpose in Phyllis's case. (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1129 [63 Cal.Rptr.3d 297, 163 P.3d 4] ["it is enough that the assaults were admissible in the murder case; 'two-way' cross-admissibility is not required"]; *People v. Cunningham* (2001) 25 Cal.4th 926, 985 [108 Cal.Rptr.2d 291, 25 P.3d 519] ["complete cross-admissibility is not necessary to justify the joinder of counts . . ."]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1] [even though evidence of murder was not admissible at a separate trial for robbery counts, "complete cross-admissibility is not necessary to justify joinder"].) Nevertheless, we conclude that the trial court did not abuse its discretion in determining that the similarities in these two cases were sufficient to permit evidence regarding Somsri's death to be cross-admissible to establish the identity of Phyllis's killer, despite the higher degree of similarity that is required to establish relevance on the issue of identity. (See *Lenart, supra*, 32 Cal.4th at p. 1123 ["To be relevant to prove identity, the uncharged crime must be highly similar to the charged offenses . . . ."].)

■ " 'For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." [Citation.]' [Citations.]" (*People v. Britt, supra*, 104 Cal.App.4th at p. 505.) New maintains that the circumstances of the deaths of Somsri and Phyllis are not sufficiently similar and distinctive to support the inference that the same person committed both acts. We disagree. New asserts that the only similar circumstances are that (a) "neither woman was in a position to be aware of the impending injury," (b) the victims were killed at night, (c) the victims were New's wives, (d) New was the beneficiary of insurance policies on both women, (e) the victims both died "as a result of trauma to the back of the head," and (f) New was the last person to see both women alive. He argues that these circumstances "[o]bviously [do] not" present " 'unusual and distinctive characteristics,' " and he further contends that a single remaining circumstance—the fact that a firearm was used to kill both women—is "not such an unusual or unique characteristic that, by itself, it makes the circumstances of these incidents cross admissible within the ambit of Evidence Code section 1101 (b)."

Any one of these similarities, if viewed in isolation, might not be sufficient to support an inference that New was the person who shot both Somsri and

Phyllis. However, when the similarities are viewed in the aggregate, the pattern of similar characteristics is sufficiently unusual and distinctive that a rational inference of identity may be drawn. In particular, the fact that each of the victims was married to New at the time she was shot in the head is a critically unusual and distinctive characteristic. The similarity in the two women's deaths becomes even more pronounced when one considers the additional facts that both women appeared to have been asleep when shot, both were shot from relatively close range, New was the last person to see each of the women alive, and New was the beneficiary of both women's life insurance policies. Because the offenses had a number of shared marks and had multiple characteristics that bear some degree of distinctiveness, the trial court did not abuse its discretion in determining that the evidence of Somsri's death was relevant to the issue of the identity of Phyllis's murderer, and in concluding that this evidence would be cross-admissible in Phyllis's case.

### b. *The evidence regarding Somsri's murder was not so weak as to require severance*

New contends that he suffered "serious prejudice" because "the jury undoubtedly cumulated the evidence of the two crimes in order to find Mr. New guilty of both." According to New, the "evidence for the 1973 case is so minimal that most likely it could not exist independently of the 2004 case," such that the "stronger 2004 charge bolsters the weaker 1973 case, thus creating an improper cumulative effect."

We disagree with New's assertion that the evidence was relatively weak as to Somsri's murder and relatively strong as to Phyllis's murder. There was a variety of evidence that conflicted with New's story about his having dropped the gun and having accidentally fired it at Somsri. Although New claimed that when he shot the fatal bullet, Somsri was lying in the same position in which police found her, evidence from the scene suggested otherwise. There was evidence that Somsri was sitting much higher in the loveseat when she was shot than the position she was in when she was found. There was no bullet hole in the pillow under Somsri's head, yet the bullet should have traveled through the pillow if Somsri had been asleep, in the same position, at the time she was shot. Other evidence demonstrated that Somsri could not have been shot from six to 12 inches above the floor, as New claimed. The trial court did not err in determining that the evidence regarding Somsri's murder was not so weak that the two counts had to be severed for trial.

### c. *New failed to request limiting instructions*

New asserts that the trial court had an obligation to give limiting instructions, sua sponte, regarding the jury's consideration of the cross-admissible evidence. We disagree.

■ Conceding that he did not request a limiting instruction at trial, New acknowledges that a trial court generally has no duty to give an instruction limiting the purpose for which the jury may consider evidence when the defendant has made no request for such an instruction. (See *People v. Rogers* (2006) 39 Cal.4th 826, 853–854 [48 Cal.Rptr.3d 1, 141 P.3d 135] (*Rogers*) ["We have held a trial court has no 'duty to furnish a limiting instruction on cross-admissible evidence in a trial of multiple crimes' on its own motion."].) New argues that this case presents the rare situation in which the trial court's sua sponte duty to give a limiting instruction was triggered. "In the context of limiting instructions concerning evidence of other crimes, we have recognized a narrow exception to the general rule not requiring sua sponte instruction: an objection may not be required in the 'occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.' [Citations.]" (*Id.* at p. 854.) According to New, "the improper use of the evidence relating to separate counts present those extraordinary circumstances in this case."

Contrary to New's assertion, this case does not present the exceptional situation. Evidence regarding each murder was not a " 'dominant part of the evidence' " against New as to the other murder. (*Rogers, supra,* 39 Cal.4th at p. 854.) In addition, while the evidence was prejudicial, it was not unduly so, and the evidence in question was clearly more than " 'minimally relevant to any legitimate purpose.' " (*Ibid.*) We therefore reject New's contention that the trial court had a sua sponte duty to instruct the jury with a limiting instruction concerning its use of the cross-admissible evidence.

New also argues that even if the court did not have a sua sponte duty to give a limiting instruction, this court should consider the failure to do so in evaluating the prejudice New suffered as a result of the joinder. New essentially argues that the joinder and the resulting admission of evidence regarding both cases resulted in a denial of his right to a fair trial. In light of the fact that evidence as to each murder was cross-admissible and that the evidence was more than minimally relevant to establishing New's intent in one case and his identity in the other, New has not established that the joinder of counts in this case rose to the level of a constitutional violation. (See *People v. Sapp* (2003) 31 Cal.4th 240, 259–260 [2 Cal.Rptr.3d 554, 73 P.3d 433] ["Having concluded that defendant suffered no prejudice from the joint trial of the three murder counts, we also reject his contention that the joint trial violated his due process rights."].)

## IV.

## DISPOSITION

The judgment of the trial court is affirmed.

Nares, Acting P. J., and Haller, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 27, 2008, S164546.