Filed 10/16/23  P. v. Karlsen CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| THE PEOPLE, | C091740 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F6380) |
| v. | |
| KARL HOLGER KARLSEN, | |
| Defendant and Appellant. | |

In 2020, defendant Karl Holger Karlsen was found guilty of the 1991 first degree murder of his wife Christina K., which the jury found he committed for financial gain. The jury also found defendant had been convicted in 2013 of the 2008 murder of his and Christina's son, Levi K.  On appeal, defendant raises several contentions:  (1) he was denied due process by the extensive delay between Christina's death and the filing of the complaint; (2) the prosecution lost evidence that prejudiced his defense; (3) the trial court committed multiple instances of instructional error, primarily related to the propensity and character evidence instructions; (4) the trial court abused its discretion under

1

Evidence Code section 352 by admitting into evidence the entire interview between himself and New York investigators questioning him about Levi's death; (5) his attorney was ineffective for failing to object on hearsay grounds to several of his interviews with various investigators; (6) he was cumulatively prejudiced by the alleged errors; and (7) the trial court erroneously imposed direct victim restitution, or in the alternative, imposed too much restitution and interest.

We agree too much restitution was imposed. Accordingly, we modify the judgment to strike the statutory restitution fine of $10,000 under Penal Code[1] section 1202.4, subdivision (b). We affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Fire*

On January 1, 1991, a fire started in the house defendant shared with his wife Christina and their three children in Calaveras County. The house was old and the family lived in it in exchange for agreeing to update and improve the house in the amount of at least $300 a month. At the time of the fire, Christina was taking a bath in the hallway bathroom; the children, who were between the ages of approximately four and six years old, were napping; and defendant was outside the house in a nearby garage. Defendant saved his three children but not Christina. Christina was unable to get out of the bathroom and died from smoke inhalation.

In the hours, days, weeks, and years after the fire, defendant told various people how he believed the fire started, why Christina was unable to escape the bathroom, and why he was unable to save her. Defendant's accounting, and/or the witnesses' memory of it, differed in many details, most of which we do not recount. Essentially, defendant

---

[1] Further section references are to the Penal Code, unless otherwise indicated.

2

said that, in the days before the fire, the window in the bathroom broke, and he boarded it with a piece of plywood secured by 17 nails hammered into the drywall surrounding the window. Also in the days before the fire, over a gallon of kerosene was accidently spilled in the hallway outside the bathroom. One person who visited the house before the fire saw the boarded window in the bathroom and smelled the kerosene in the hallway, while other visitors to the home did not. According to defendant, after the kerosene spill, he brought down the family's boxed winter clothes from the attic and filled the hallway with dozens of boxes, inadvertently soaking up the kerosene still in the carpet. Defendant and Christina saw how well the boxes absorbed the spilled kerosene from the carpet and used more clothing and cardboard for that purpose. At some point, Christina washed the kerosene-soaked clothing in the washing machine. According to defendant, when she put the clothes in the dryer, the house filled with kerosene fumes and smoke, causing the smoke detectors to sound.

As for the day of the fire, defendant told people he took the children outside the house before noon to burn the tree they had displayed during Christmas. While burning the tree with kerosene as an accelerant, defendant made a point of telling his children to pay attention, so they would know how quickly a house could burn. After burning the tree, the family went into the house to rest before a planned shopping trip. The couple's daughters took a nap in the daughters' room, and their son Levi napped in his room. Christina eventually took a bath.

While Christina was bathing, defendant decided to work on the fan in the attic. The attic access was in the ceiling in the main hallway of the house. Defendant told various people that he used a utility light to help him see while he was working in the attic, but the utility light was broken and no longer had the hook at the top that would secure it in place and allow it to hang. While working, defendant realized he needed something from the nearby detached garage and left the house to get it. While in the garage, defendant heard Christina call his name. At first, defendant thought nothing of it

3

and continued working.  Then, Christina called for defendant using his first and middle names, which defendant thought was odd, so it got his attention.  Christina also yelled for defendant to "get the kids."

Defendant looked at the house and saw smoke coming out of it.  He ran to the front door to find a wall of flames that he could not penetrate because it was too hot.  Defendant then went to Levi's bedroom window and broke it open.  A ball of fire exploded from the window and pushed defendant back, burning his forehead and singeing his hair.  Defendant then grabbed Levi, who had jumped down from his bunk bed.  Defendant put Levi in his truck and then went to his daughters' bedroom window.  He broke the window to that room as well and removed his two daughters, who were laying on the floor.  Defendant put his daughters in the truck.

Defendant told investigators as well as family and friends that, after saving the children, he could not rescue Christina, so he drove to a neighbor's house to call 911.  He then drove back to the house, at which point the house was engulfed in flames, and then drove to the end of his driveway to wait for the emergency response.

Defendant's older daughter testified that, once she and her siblings had been rescued from the house and placed in the truck, defendant went to the bathroom window and kicked at the house below the window.  Defendant did not attempt to remove the board from the window or otherwise rescue Christina.  Once defendant returned to the truck, he watched the house burn for a "few moments" before his older daughter told him they needed to get help.

When firefighters arrived, they attempted to make entry into the house.  One group of firefighters entered the house through the back door but were blocked from searching for Christina in the smoky house by obstructions in the hallway that prevented them from proceeding.  Because nobody was able to search the house, the firefighters surrounded the house and sprayed it with water until the fire was extinguished.

During defendant's interactions with first responders and family, he appeared emotionless and calm. Christina's body was discovered in the bathroom of the home. She was not burned and was holding a washcloth to her face. While the walls to the bathroom were black from smoke damage, it did not appear that flames had penetrated the bathroom.

For a few days after Christina's death, defendant lived apart from his children and barely saw them. When telling Christina's sister that she could not see Christina's body, defendant described Christina as a "crispy critter," even though Christina had not been burned in the fire.

Following Christina's death, defendant's brother and sister-in-law came into town from New York for support. During their trip, they visited a national forest with defendant on defendant's recommendation. While visiting the national forest, defendant decided to move with the children to New York to be near his large family. Defendant and the children left for New York on the same day his brother and sister-in-law left, which was January 5, 1991. While defendant had a large and close-knit family he lived near in the years that followed, he rarely spent time with them and kept his children isolated.

II

*Investigations*

The night of the fire, the State Department of Forestry and Fire Protection (CAL FIRE)[2] conducted a preliminary investigation through Deputy Warden Robert Monsen. Deputy Warden Monsen found a utility light with a broken bulb on the carpeted floor at the entry of the hallway that also contained the bathroom. He also found one smoke detector that did not appear to be connected to the wall or contain batteries at the time of

---

[2] At the time of the fire, CAL FIRE was known as the Department of Forestry.

5

the fire. There were several items of clothing and a cardboard box in the hall that smelled like kerosene. Burn patterns showed the fire originated in front of the bathroom and then spread throughout the house. On April 15, 1991, defendant called Deputy Warden Monsen asking why the fire investigation had not been released to State Farm Insurance Company (State Farm), the insurance company that issued a life insurance policy on Christina. Deputy Warden Monsen recorded the conversation and it was played for the jury.

CAL FIRE Investigator Carl Kent investigated the fire a little over a week after it occurred. When he arrived, the house had already been overhauled and removed of debris. Investigator Kent found two or three smoke detectors that did not appear to be operational during the fire. There was cardboard on the carpet in the hallway and the hallway had a strong smell of kerosene. Investigator Kent tested the carpet and it was still flammable, indicating it was "well saturated with kerosene." The burn patterns in the carpet indicated the fire started in the hallway between the laundry room and the bathroom. Investigator Kent found the utility light in the hallway outside the bathroom. The bulb was elongated, meaning it had been heated by fire from underneath.

Investigator Kent wanted to interview defendant and the children in person but was unable to do so because defendant had moved to New York. Defendant, however, called Investigator Kent on February 4, 1991, and Investigator Kent recorded the conversation. The recording was played for the jury, wherein defendant recounted the events of the day of the fire and voiced his hope that the process of getting his insurance payout would be quick. Defendant also indicated he believed the utility light started the fire.

As part of his investigation, Investigator Kent compiled a report. CAL FIRE had a records disposal policy that called for the disposal of files after seven years. Because of the policy and the suspicious nature of the case, Investigator Kent kept portions of the file

6

at his home believing he would be called to testify someday. The rest of the report was destroyed per CAL FIRE's policy.

After the fire, defendant made a claim to State Farm on Christina's life insurance policy. The policy was only a few weeks old and still within the contestability period, so State Farm initiated an investigation. Ultimately, the agent assigned to perform an investigation recommended State Farm deny the claim because the fire appeared to have been deliberately set. Management in State Farm's corporate office did not follow the agent's recommendation and paid the claim on Christina's life insurance. The State Farm representative who testified about the payment of insurance proceeds said the check was paid to defendant on January 31, 1992 or 1993, and that a document reflected the check was paid in 1992.

The agent who recommended denying the life insurance claim based her recommendation on several factors. First, she believed the circumstances under which defendant and Christina took out life insurance were suspicious in many ways. For instance, defendant had initiated contact with a local insurance agent to purchase life insurance. This was uncommon in the world of life insurance, which is typically provided through an employer or business account. Further, defendant was alone when he first inquired about life insurance, and Christina was not present until the time of signing. Defendant was told that State Farm's policy was to require married couples to have the same amount of coverage, and he assured the local agent that he did have similar coverage to the $100,000 policy he requested for Christina. But then when purchasing the life insurance for Christina, defendant could not prove coverage and purchased life insurance for himself as well to meet the requirement. While defendant initially said he wanted to purchase a $100,000 policy on Christina and $50,000 policies on each of the children, he ultimately purchased $200,000 policies for himself and Christina and $100,000 policies for each of the children. Defendant's and Christina's policies were whole life insurance policies that could be used as retirement accounts. The children's

7

policies could later be used as education accounts. It was also odd to the State Farm agent that defendant took out policies requiring premiums that constituted such a large percentage of the family's household income. After Christina's death, defendant opted not to reinstate the life insurance policies for the children and stopped paying premiums on his own life insurance policy.

The insurance agent's recommendation to deny defendant's claim was also based on the conclusion of an investigator retained by State Farm that the fire was deliberately set. State Farm's investigator determined the fire started in the hallway in front of the bathroom and that the carpet in the hallway contained kerosene that had diffused throughout a large area. State Farm's investigator, however, noticed a horseshoe burn mark on the carpet, and flooring beneath it, located outside the bathroom. The burn mark indicated the fire had burned longer and more intensely on the horseshoe mark as compared to other portions of the kerosene-soaked carpet. State Farm's investigator conducted tests to recreate the marking and did so by applying kerosene to carpet taken from the house and letting the kerosene wick for a day or more. State Farm's investigator then applied more kerosene to the carpet in a distinctive marking and lit the carpet on fire. The fire burned more intensely on, and mimicked the distinctive marking created by, the fresh application of kerosene. Given these results, State Farm's investigator concluded that not only had kerosene been present on the carpet in the days before the fire, but there had also been a fresh application of kerosene minutes before the fire. State Farm's investigator further concluded the fire was deliberately set because he disqualified all potential sources of accidental fire, including the utility light and multiple heaters in and around the house at the time of the fire.

The insurance agent who recommended denying defendant's claim lastly relied on her March 1991 interview with defendant in New York. During that interview, defendant related essentially the same story he had related to everyone else but left out minor details until asked by the insurance agent. The insurance agent's report that included her

8

recommendation and the entire investigation compiled by State Farm's investigator, including the utility light, was retained by State Farm and disposed of seven years after the investigation. State Farm's investigator also disposed of the carpet samples from the house upon the request of an employee of State Farm.

III

*Prior Acts Evidence And Defendant's Admissions*

During defendant's marriage to Christina, he called her names such as "fatty" and "chubby." Christina also acted differently when defendant was around her, compared to when he was not around her. When Christina was without defendant, she was warm, joyful, and relaxed. When defendant was around her, she was reserved and anxious. Indeed, defendant's older daughter testified that, while living in Calaveras County with her parents, the atmosphere was always tense when defendant was around. If defendant was in a good mood, everyone had fun. But if defendant was in a bad mood, then the rest of the family would stay out of his way. Once, while in Calaveras County, defendant's older daughter saw her father kick a plastic egg crate through the front door leaving a hole in the door.

Defendant was also abusive towards Levi. Before Christina's death, defendant's sister-in-law saw defendant hit Levi several times on the head with defendant's knuckles. Levi would grimace in pain and look afraid but would not cry. Around the time of the fire, Christina's cousin was visiting the family and saw Levi run into the house crying and as though he were being chased. She saw defendant standing at the front door and slam down a chair. After the fire, Christina's cousin went to the burned house several times and recorded the fire scene. The recordings were played for the jury without audio.

After Christina's death, defendant's older daughter saw a "multitude of incidents" where her father physically abused Levi. Once, her father broke a multi-inch cutting board over Levi's backside. Often, the abuse involved fists, but it also involved items that could be used as weapons, such as "cattle prods, pipes, shovels, [and] pitchforks."

9

Defendant's older daughter and Levi believed defendant murdered their mother. Once, they confronted their father with their suspicions and defendant's only concern was for his image and what the community's perception of him would be if word got around that his own children thought he murdered their mother. Defendant and Levi then got into a fist fight. Defendant's older daughter never reported defendant's abuse towards Levi because defendant threatened the children that if they ever tried to "report [the abuse] to the police[,] that [they] should call the police and call an ambulance because [they] would be dead by the time [the police and ambulance] got there."

Defendant first received insurance proceeds in 1986 after he bought a new car. Soon after purchasing the car, it burst into flames in his driveway and defendant collected the insurance money he had obtained on the car. Before the fire started, defendant removed car seats and opened the hood of the car to air out the gas fumes he smelled emitting from the vehicle. The insurance company that held the policy on the car approved defendant's insurance claim and gave defendant money for his loss. It does not appear the incident was ever criminally investigated.

Defendant collected insurance proceeds again in 2002 when his barn completely burned with several horses inside. Before the fire, defendant increased the amount of coverage on the barn. Defendant and his father were both listed as beneficiaries on the insurance policy. Defendant's brother testified that defendant had rebuilt the barn after the fire and perhaps replaced the horses. Upon investigation by the insurance company that held the policy on the barn, no origin of the fire was determined and the fire was ruled an accident. The interview between defendant and the insurance investigator was played for the jury.

In 2008, Levi died when a vehicle he was working on fell on top of him. A few weeks before his death, Levi obtained life insurance on himself at defendant's urging. The two went into the insurance office together to purchase the policy, which paid

10

$700,000 in the event of an accidental death. Defendant was listed as the beneficiary, even though Levi had two young daughters.

In 2012, investigators in New York reopened the investigation into Levi's death and interviewed defendant about it. Approximately eight and a half hours of the nine-and-a-half-hour interview between defendant and the New York investigators was played for the jury. Over the course of the interview, defendant made increasingly incriminating statements, ultimately admitting he was inside the truck when it fell on Levi. According to defendant, he panicked and left his son under the truck for more than four hours, instead of calling for help. During the interview, defendant also described how he assisted Levi in obtaining life insurance shortly before Levi's death and how Levi named defendant as the beneficiary of the policy, but had intended for defendant to administer the funds for the benefit of Levi's two daughters.

In December 2012, after defendant was arrested for Levi's murder but before resolution of the case, defendant's older daughter visited him while he was in police custody. During the visit, she told defendant she knew he had killed her brother and her mother. Defendant responded by "grin[ning] like a Cheshire cat and t[elling her] that it had been 20 years and they hadn't caught him yet" and "they're not going to."

On November 6, 2013, defendant pled guilty to the second degree murder of Levi. As part of the plea, defendant admitted "that on November 20th, 2008, he was at his residence in a garage with his son . . . . He admitted that he had jacked up a vehicle with a wobbly jack. He admitted that he knew it was dangerous for someone to be underneath that vehicle. He admitted that he enticed Levi . . . to get under that vehicle. [¶] He admitted that he caused that vehicle to fall on Levi . . . . He admitted that [Levi] was still alive after this vehicle fell on him. And he admitted that he laughed [*sic*] knowing that by leaving[,] it would result in the death of Levi."

Following defendant's conviction for Levi's murder, defendant was interviewed by Calaveras County District Attorney Investigator Jerry Whitney. During the six-and-a-

11

half-hour interview, an edited version of which was played for the jury, defendant again described the events of the days before and after the 1991 fire, as well as his conduct during the fire. Defendant also extensively described his marriage with Christina, claiming she was the perfect wife and they were happy.

IV

*Trial Proceedings*

The jury found defendant guilty of one count of murder during the commission of arson or with premeditation, deliberation, and malice aforethought. It also found the murder was carried out by defendant for financial gain and that he had previously been convicted of a murder.

The trial court sentenced defendant to life without the possibility of parole to be served consecutive to the sentence imposed for Levi's murder. During victim impact statements, defendant's daughters spoke about how their father and his second wife used Christina's life insurance proceeds and made them pay for their own necessities. The trial court imposed direct victim restitution under section 1202.4, subdivision (f) to Christina's heirs in the amount of $200,000, plus 10 percent interest from the date the check was received by defendant. The date appearing on the abstract of judgment is February 1, 1992. When imposing direct victim restitution, the trial court reasoned the $200,000 figure was the amount defendant unlawfully received in insurance proceeds for Christina's death.

Defendant appeals.

DISCUSSION

I

*The Delay In Prosecution And Disposal Of Evidence Did Not Violate Due Process*

Defendant contends he was denied due process by the prosecution's delay in bringing charges against him and by the disposal or loss of evidence during the years of the delay. We disagree.

## A

### *Background*

In the prosecution's opposition to defendant's motion to dismiss, it provided a timeline of the investigation. The day after the fire, a pathologist performed an autopsy on Christina and concluded her cause of death was smoke inhalation from a structure fire. Based on this information, the Calaveras County coroner ruled Christina's death an accident. Two days after the fire, the Calaveras County Sheriff's Office completed a report, but deferred its criminal investigation pending the outcome of the fire investigation.

Deputy Warden Monsen and Investigator Kent conducted a fire investigation and became suspicious that defendant could have intentionally set the fire to kill Christina given the recent life insurance policy and the circumstances of the fire. Deputy Warden Monsen and Investigator Kent briefly interviewed defendant and his older daughter, but were prevented from conducting further interviews because defendant moved to New York with his family four days after the fire. Based on the evidence collected at that time, the Calaveras County District Attorney's Office believed there was insufficient evidence to charge defendant with his wife's murder. Neither the district attorney's office nor CAL FIRE would cover the travel cost for Deputy Warden Monsen and Investigator Kent to further interview defendant and his children.

According to the prosecution, despite the district attorney's office requesting the men to continue their investigation, the case remained unsolved. When Investigator Kent retired, he took a portion of the investigative file related to defendant's case with him. This portion included information he had gathered and information State Farm had gathered as part of its investigation.

In November 2012, defendant was charged in New York with the 2008 murder of Levi, which occurred three weeks after defendant had assisted Levi in setting up a life insurance policy naming defendant as the sole beneficiary. Upon learning of these

13

allegations, the Calaveras County Sheriff's Office assigned a detective to Christina's case, who learned the original investigative file no longer existed, and thus obtained the portion kept by Investigator Kent. The district attorney's office took over the investigation in June 2013 and interviewed over 75 relevant witnesses, including defendant's older daughter and the investigator retained by State Farm. In those interviews, the witnesses related information they could have related at the time of the fire, except for defendant's older daughter who recounted incidents of domestic violence perpetrated by defendant against Levi. She also recounted the incriminating statement her father made while in police custody in New York.

The district attorney's office also received information from New York authorities, including that defendant had collected insurance money following a car fire in 1986 and insurance money following a barn fire in 2002. Further, in December 2013, defendant pled guilty to his son's murder. Based on this new information, the coroner who signed the victim's death certificate recommended Christina's cause of death be changed to murder.

Defendant was charged by complaint on August 29, 2014, and trial began on January 8, 2020.

In his motion to dismiss, defendant argued he was prejudiced by the prosecution's delay in bringing charges against him because "the fire scene with all the contents was completely [destroyed]. A significant amount of the evidence gathered in the initial investigation ha[d] been lost or destroyed. Medical records for [defendant], who was transported to the hospital in an ambulance, no longer exist to show his injuries. Most of the fire reports of the fire crew and investigators have been lost or destroyed. The photographs of the fire scene taken by an expert hired by the insurance company (142 in number) have been lost or destroyed. The emergency 911 call and dispatch records have been destroyed, as have bank records of [defendant]. [And four] material witnesses have

14

died." Further, because of this missing or destroyed evidence, defendant did not believe he could receive a fair trial.

The prosecution urged the court to defer ruling on defendant's delay contention until after trial or, in the alternative, to deny the motion to dismiss. The prosecution further urged the trial court to deny defendant's motion to dismiss on the grounds the government unlawfully disposed of evidence because the disposal was not intentional.

Following argument on the motion, the trial court found that the prosecution "did not delay the filing of the criminal charges in this case with any intent to prejudice the defense." Instead, it appeared to the trial court that the renewed investigation and filing of charges was motivated by Levi's murder for financial gain, which served as admissible character evidence. The court recognized the prosecution was just as prejudiced by the delay and unavailability of evidence as defendant was prejudiced, and much of the lost evidence could be substituted by other evidence that was still available. Ultimately, however, the trial court deferred the ruling on defendant's motion to dismiss until the end of trial so it could more accurately assess the prejudice to defendant.

After the presentation of evidence, the trial court addressed defendant's motion to dismiss based on a due process violation. The trial court ruled defendant had not demonstrated "there was any purposeful conduct by the district attorney to delay the prosecution in order to [deprive] the defendant [of] a fair trial." After brief argument by the parties, the trial court denied the motion.

B

*The Justification For The Delay Outweighed*

*The Prejudice Resulting From The Delay*

Ordinarily, the statute of limitations is considered "the primary guarantee against bringing overly stale criminal charges," and "[t]here is no general right to a prosecution speedier than that laid down by the statute of limitations." (*People v. Archerd* (1970) 3 Cal.3d 615, 639.) Where, as here, however, the Legislature did not provide a

15

limitations period for bringing the criminal charges (§ 799, subd. (a) [no statute of limitations for offense punishable by imprisonment for life without the possibility of parole]), "[t]he due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging" (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*)).

The due process analysis under the California Constitution is at least as favorable to a defendant as the analysis under the federal Constitution. (*Cowan*, *supra*, 50 Cal.4th at pp. 430-431.) We thus apply California law. (*Id.* at p. 431.)

To establish a due process violation, " '[a] defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time. [Citation.] Prejudice to a defendant from precharging delay is not presumed. [Citations.] In addition, although "under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. . . . If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." [Citation.] If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay.' " (*People v. Jones* (2013) 57 Cal.4th 899, 921 (*Jones I*).) "We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]." (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

From the trial court's statements, it is clear it considered the reason for the prosecution's delay, and we can thus infer it undertook a balancing analysis weighing the prosecution's justification for the delay against the prejudice to defendant, ultimately

16

concluding defendant did not make a sufficient showing of prejudice to demonstrate a due process violation. Thus, we will review for an abuse of discretion the trial court's decision that the justification for the delay outweighed the resulting prejudice.

"Prejudice may be shown by ' "loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay." ' " (*Cowan*, *supra*, 50 Cal.4th at p. 430.) The showing of prejudice must be made on competent evidence and "must be supported by particular facts and not . . . by bare conclusionary statements." (*Crockett v. Superior Court of Santa Clara County* (1975) 14 Cal.3d 433, 442.)

Defendant's showing of prejudice is relatively weak. First, defendant points to the loss of the fire scene; however, much of that loss was a consequence of firefighters' efforts to suppress the fire and make the scene safe for inspection, and not because of the delay in prosecuting defendant. For example, the cardboard on the hallway floor had already been removed by the time State Farm's investigator investigated the origin of the fire five weeks after the fire, while Investigator Kent was still compiling his report. Further, the removal of the cardboard did not have any effect on the investigation. State Farm's investigator testified that the nature of fire investigations is that an investigator can tell when a relevant piece of material is missing from a fire scene. Here, Deputy Warden Monsen and Investigator Kent testified to the presence of cardboard in the hallway but based their opinion that the fire started in the hallway on markings on the carpet and the flooring underneath. State Farm's investigator also based his opinion of the origin and ignition source of the fire on the flooring and found the presence of cardboard irrelevant to that opinion. Thus, State Farm's investigator would have made the same conclusion regarding the origin and source of the fire had the cardboard still been present in the hallway at the time of his investigation, contrary to defendant's assertions.

17

Defendant also points to the disposal of the utility light as being prejudicial. He argues its absence eliminated his ability to refute State Farm's investigator's conclusion that the utility light was not the ignition source of the fire. Similarly, defendant argues the absence of the fire scene as a whole eliminated his ability to refute State Farm's investigator's conclusion candles were not the ignition source of the fire. To be clear, defendant does not argue the utility light and fire scene were never adequately examined, only that his expert could not repeat the examinations to potentially challenge the prosecution's expert witness. That the evidence would have led to defendant's ability to impeach or challenge State Farm's investigator's conclusions is merely speculative, and not the basis for a strong showing of prejudice, let alone a due process violation. (See *Crockett v. Superior Court of Santa Clara County*, *supra*, 14 Cal.3d at p. 442; see *People v. Lewis* (2015) 234 Cal.App.4th 203, 213 ["Our Supreme Court has repeatedly found speculative arguments inadequate to establish the actual prejudice required for delayed prosecution to constitute a due process violation"].) Indeed, a picture of the utility light was admitted into evidence, as well as the testimony of Deputy Warden Monsen, Investigator Kent, and State Farm's investigator describing their observations of the utility light. Several of defendant's own statements describing the state of the utility light at the time of the fire were also admitted into evidence. Defendant did not take issue with State Farm's investigator's scientific process leading to his conclusion the utility light did not ignite the fire—as defendant's expert said was prudent, State Farm's investigator examined the utility light's cord and the outlets in the home. As for the possibility that candles ignited the fire, defendant's expert testified that in many fires started by candles, the remnants of the candles were not found. Thus, even if defendant's expert could examine the utility light and fire scene for possible ignition sources, the possibility that he could challenge State Farm's investigator's conclusions as to the ignition source of the fire is merely speculative.

18

In this same vein, defendant points to the loss of the original piece of carpet depicting the horseshoe pattern that State Farm's investigator compared to his own carpet burning test. That piece of carpet was destroyed, which, according to defendant, made it impossible to challenge State Farm's investigator's conclusion the horseshoe pattern depicted a second kerosene pour that was lit soon after it was poured. The carpet can fairly be described as a material piece of evidence. (See *Cowan*, *supra*, 50 Cal.4th at p. 430 [loss or destruction of material physical evidence is prejudicial].) Indeed, it provided a scientific basis for the prosecution's theory that defendant deliberately set the fire by applying an accelerant to the carpet right before igniting it. On the other hand, defendant only claims his ability to challenge or confirm State Farm's investigator's opinion was affected. He acknowledges the carpet was available for initial testing and was tested by State Farm's investigator. Thus, while the carpet is a material piece of evidence, the consequences of its loss are merely speculative.

Defendant points to other items from the house he was not able to independently test, such as the washer and dryer. For the same reasons the loss of the utility light is not prejudicial, neither is the loss of the washer and dryer. Again, defendant does not point to faults in State Farm's investigator's testing,[3] only the potential to challenge the investigator's conclusions after performing his own tests. The same is true as to defendant's claims he was prejudiced by the lack of multiple investigative and fire reports. His claims of prejudice are limited to the possibility he could have used the lost reports to challenge the testimony by the investigators and firefighters who compiled the

---

[3]     Defendant's expert testified that he would have taken the washer and dryer into evidence and requested an engineer to examine them, including an examination of the machines' wiring and internal components. Defendant's expert was not an engineer and could not provide competent testimony as to the proper method of testing whether the washer and dryer ignited the fire. State Farm's investigator was an engineer and he testified that he externally examined the washer and dryer such that he was satisfied the machines did not ignite the fire.

reports or could have impeached the witnesses who contributed statements to the reports. This basis of prejudice is speculative.

Defendant also points generally to the witnesses' fading memories. Witnesses testified and were extensively questioned about their memories and ability to recall so long after Christina's death. The jury was able to assess the witnesses' credibility. Defendant does not explain how specific instances when witnesses lacked the ability to recall prejudiced him besides to argue time adversely affects everyone's memory. That is not a basis for finding a due process violation. (See *Serna v. Superior Court* (1985) 40 Cal.3d 239, 250 [a "court need not accept a conclusory statement that the lack of recall demonstrates prejudice where no effort has been made to ascertain the basis for the charge. Lack of recall may establish prejudice, but only on a showing that the memory loss persists after reasonable attempts to refresh recollection"].)

Defendant claims he was prejudiced by the loss of records that tended to support his version of events. Specifically, defendant points to the loss of his medical records, his bank records, and the 911 call log, claiming he was prejudiced by the records' absence because they would have confirmed he was more than slightly injured by the fire, he was desperately seeking help, his demeanor was odd in the days after the fire because he was taking mood-altering medications, and he paid for himself and his family to move to New York instead of taking advantage of his brother's generosity. None of this evidence was particularly material to undermining the prosecution's case. (See *Cowan*, *supra*, 50 Cal.4th at p. 430 [due process violation can be shown through the loss of material evidence].) The prosecution's case hinged on scientific evidence demonstrating how the fire started and defendant's pattern of collecting insurance proceeds under suspicious circumstances. Defendant's demeanor and affect around the time of the fire and shortly thereafter added little to, and did not refute, that body of evidence.

Further, the suggestion that those records would support defendant's version of events is merely speculative. The evidentiary basis for defendant's assertions that he was

more than slightly injured and desperately seeking help during the fire and on medication after the fire came from his own self-serving statements to fire and medical personnel. Other witnesses testified to the minimal injuries they observed on defendant after the fire and to his odd demeanor during and in the days following the fire. Further, defendant's brother testified he could not recall defendant ever repaying him for the flights to New York after Christina's death. That the records support defendant's version of events as opposed to all the other witnesses who testified at defendant's trial is merely speculative and not the basis for a finding beyond minimal prejudice. (See *People v. Lewis*, *supra*, 234 Cal.App.4th at p. 213.)

Defendant also points to the loss of hundreds of pictures that were taken of the fire scene. But again, defendant can demonstrate only minimal prejudice, if any, from the loss of the photographs because other photographs were retained as well as a video recording of the interior of the house. Further, witnesses who observed the burned interior of the house testified as to their perceptions. Defendant points to specific photographs that were lost, such as the exterior of the house, the burned Christmas tree, and frozen pipes, but he has not demonstrated how those photographs serve as a significant source of evidence for the jury's consideration. Thus, defendant has not demonstrated anything more than minimal prejudice in that regard.

Finally, defendant points to the death of four witnesses as being prejudicial. First, defendant points to a witness who would have purportedly testified that Christina told her the kerosene spill was accidental and that defendant fixed the property where he and his family lived in exchange for reduced rent. The witness would hypothetically also have testified that Christina told her she wanted to move to New York, and thus, according to defendant, the witness would have refuted the consciousness of guilt inference the jury was permitted to draw from his prompt move following Christina's death. We do not discern any prejudice to defendant with the loss of this witness. It was not a contested issue that at least some of the kerosene was spilled, likely accidently, and had remained

21

in the house for several days before the fire. Indeed, a witness other than defendant testified to that very fact. It was also not a contested issue that defendant and Christina fixed the house they lived in for a reduction in rent. Finally, we do not see how Christina's willingness to move to New York pursuant to an unsettled future timeline refutes the inference that defendant's move after Christina's death and in the early stages of the fire investigation demonstrated a consciousness of guilt.

The second witness defendant points to would have purportedly testified that Christina told her the kerosene spill was an accident and that the witness had observed nothing wrong in defendant and Christina's relationship when dining with them the night before the fire. As discussed, it was uncontested that at least some of the kerosene spill had been accidental, and thus this witness would have added little to the body of evidence presented at trial in that regard. Also, this witness's observations of Christina and defendant the night before the fire would have been of limited relevance and not central to the prosecution's case, which rested on scientific evidence and defendant's similar conduct with respect to the procurement of insurance proceeds. The fact that defendant got along with his wife the night before her death does little to change the inferences drawn from the bulk of the prosecution's evidence.

The final two witnesses who defendant believes were essential to his defense were defendant's neighbors who purportedly witnessed him frantically request that they call 911 and witnessed him help emergency personnel responding to the fire. According to defendant, those witnesses would have testified he was not emotionless during the fire, as other witnesses recounted. Again, defendant's demeanor during the fire was not a critical component of the prosecution's case compared to the scientific evidence and defendant's pattern of collecting insurance proceeds under suspicious circumstances. But still, those witnesses to whom defendant refers appear to be the only two witnesses who saw defendant have an emotional reaction to his wife's death and could have provided a more

22

complete picture of defendant's emotional state at the time of the fire. Thus, the loss of these witnesses resulted in more than slight prejudice.

As to defendant's own faded memory, he has not established prejudice whatsoever. Defendant contends his faded memory was used against him as an indicator he had a guilty conscience. But the prosecutor's argument was not that the jury should consider defendant's lack of recall against him, but instead that it should consider his contradictions against him. Defendant has not pointed to actual evidence, only the prosecution's argument, which is not evidence, to demonstrate that he suffered from a faded memory, and thus he has failed to meet his burden of demonstrating prejudice related to his own faded memory. (*Crockett v. Superior Court of Santa Clara County*, *supra*, 14 Cal.3d at p. 442 [prejudice must be shown by competent evidence and not be bare conclusionary statements].)

In total, most of defendant's claims of prejudice center around immaterial evidence or are based on speculation. Defendant points to a single material piece of lost evidence—the carpet—but again the effect of the loss is speculative given that the carpet was examined and tested around the time of the fire. The effect of the prejudice resulting from the death of defendant's neighbors is also uncertain. While they were the only people to witness defendant showing emotion during the fire, defendant's emotional state while initially seeking help is subject to varying inferences and only minimally relevant to defendant's guilt when compared to the physical and character evidence presented at his trial. As a result, defendant's showing of prejudice is weak.

In light of the weak showing of prejudice that resulted from the delay in prosecuting defendant's case, defendant must show more than negligence in the prosecution's delay. Indeed, " 'whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice

23

would be required to establish a due process violation.' [Citation.] The justification for the delay is strong when there is 'investigative delay, nothing else.' " (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

As the People point out, *New* is instructive. (*People v. New* (2008) 163 Cal.App.4th 442 (*New*).) In *New*, the defendant killed his first wife with a rifle in 1973 by shooting her in the head. (*Id.* at pp. 442, 453.) At the time of his first wife's death, the defendant claimed he was cleaning the rifle when it accidentally fired, killing his first wife who was asleep on the couch. (*Id.* at p. 453.) While certain measurements were taken, no blood spatter analysis was performed because that technology did not exist in 1973. (*Id.* at pp. 453-454.) The detectives who investigated the defendant's first wife's death concluded the shooting was an accident. (*Id.* at p. 454.) In 2004, the defendant killed his third wife by shooting her in the head while she was sleeping in bed. (*Id.* at pp. 442, 447-448.) This time, the defendant claimed he went to the pharmacy to buy migraine medicine for her, and when he returned, he found the home burglarized and his third wife dead. (*Id.* at p. 449.) Following defendant's third wife's death, investigators reviewed photographs and police reports from the 1973 investigation into his first wife's death, took additional measurements from the residence where the shooting occurred, and reconstructed the crime scene using computer enhancement tools. (*Id.* at pp. 454-455.) This new investigation revealed that the defendant's account of his first wife's death was inconsistent with the physical evidence. (*Id.* at p. 455.) He was subsequently tried and convicted of murdering both his first and third wives. (*Id.* at p. 458.)

The Court of Appeal rejected the claim that the 32-year delay in prosecuting the defendant for his first wife's murder deprived him of the right to a fair trial. (*New*, *supra*, 163 Cal.App.4th at p. 462.) The court acknowledged that the delay was prejudicial to the defendant but explained that many of his claims of prejudice were overstated. (*Id.* at pp. 462-464.) Turning to the justification for the delay, the court explained that

24

defendant's third wife's death was "the critical factor that caused prosecutors to reexamine the circumstances of [his first wife's] death." (*Id.* at p. 465.) Rejecting the defendant's assertion that the investigation into his third wife's death uncovered no new evidence that he murdered his first wife, the court explained the fact that "another of [the defendant]'s wives was found dead in her home, shot in the back of the head while sleeping," amounted to "new evidence that could be used to establish that [the defendant] did not accidentally shoot [his first wife], as he claimed, but rather, that he shot her intentionally." (*Id.* at pp. 465-466.)

Acknowledging the possibility that "the delay in charging [the defendant] with [his first wife]'s murder [was] in part attributable to the fact that the law enforcement officers who conducted the initial investigation into [her] death were negligent in failing to detect and/or pursue inconsistencies in [the defendant's] version of how the shooting occurred," the court nevertheless found substantial evidence supporting the trial court's conclusion that, until defendant's third wife's death in 2004, "there was simply not a prosecutable case" against the defendant. (*New*, *supra*, 163 Cal.App.4th at p. 466.) At bottom, the appellate court concluded the trial court did not err by finding that, while the "delay in prosecuting [the defendant] resulted in the loss of both physical evidence and witness testimony, and was thus prejudicial," "the justification for the delay outweighed the prejudice." (*Id.* at p. 462.)

Similarly, the delay in filing charges against defendant cannot be said to have been entirely for the purpose of investigating Christina's murder and may, in part, have been due to negligence. But substantial evidence still exists to support the trial court's factual determination that the delay was not a product of purposeful conduct on the part of the prosecution or for the purpose of denying defendant a fair trial. Contrary to defendant's assertion, the prosecution did not have a "ready-made case" against defendant following the fire and Christina's death. Initially, we note that "it is important to remember that prosecutors are under no obligation to file charges as soon as probable cause exists but

25

before they are satisfied that guilt can be proved beyond a reasonable doubt or before the resources are reasonably available to mount an effective prosecution. Any other rule 'would subordinate the goal of orderly expedition to that of mere speed.' [Citation.]" (*People v. Boysen* (2007) 165 Cal.App.4th 761, 777.)

It is true that the scientific evidence pertaining to the origin of the fire was known around the time of the fire and did not change in the years that followed. But while State Farm's investigator believed kerosene had been poured on the carpet close in time to the fire's ignition, it would not have been unreasonable to consider that a jury might have concluded the fire was accidental. It was accepted both at the time of the fire and at trial that a substantial amount of kerosene was spilled on the carpet in the hallway days before the fire. There was also evidence that the family used a kerosene heater to warm the house and often carried kerosene throughout the house. The family had even burned a Christmas tree the morning of the fire by using kerosene as an ignition source. Given the use of kerosene in and around the house, its presence on the carpet from a more recent pour could have been innocently accounted for.

Further, while State Farm's investigator ruled out all sources of accidental ignition, defendant's statements introduced the possibility of multiple potential accidental sources of the fire. For instance, defendant credited the fire's ignition to the broken utility light he was working with at the time of the fire. Defendant also stated he was working on a fan in the attic space above the hallway and had further claimed the dryer was emitting fumes from drying kerosene-soaked clothing. The house was old and had many components that did not work to modern-day standards. When weighing the opinion of an investigator hired by an insurance company versus defendant, it is not unreasonable that a jury would have given defendant the benefit of the doubt and discredited State Farm's investigator's opinion of the fire's origin.

Indeed, the only other witnesses to the fire were defendant and Christina's children, who were extremely young. Defendant's older daughter was the only one

26

interviewed by investigators and her statements confirmed defendant's basic version of the events: There was a fire while he was outside of the house, he rescued his children from the house, and was unable to rescue Christina from the bathroom. It was not until years later that defendant's older daughter looked back upon the events of that day and realized the importance of certain details and defendant's conduct that she originally had not shared with investigators. While defendant and Christina had only recently taken out life insurance policies before the fire, the life insurance policies were whole life policies that could have been converted into retirement accounts for the adults and college accounts for the children—signifying long-term goals for the policies and not just a means of collecting money. On the whole, it was not unreasonable for the prosecution to believe in 1991 that it could not prove defendant had murdered Christina beyond a reasonable doubt.

Accordingly, substantial evidence supports the trial court's factual finding that the prosecution did not delay prosecuting defendant's case to gain a strategic advantage. Like *New*, the prosecution's initial belief as to defendant's explanations may have been negligent, but defendant's subsequent similar criminal conduct provided a reasonable justification to further scrutinize Christina's death and defendant's involvement. (*New*, *supra*, 163 Cal.App.4th at p. 466.)

On balance, the weak prejudice resulting from the delay in the prosecution charging defendant was outweighed by the prosecution's strong justifications for the delay. Thus, the trial court did not abuse its discretion by finding no due process violation based on prosecutorial delay.

## C

*The Government's Disposal Of Evidence Did*

*Not Amount To A Due Process Violation*

In addition to challenging the delay in prosecution as a due process violation, defendant also challenges the prosecution's loss of evidence as constituting a due process violation. We disagree.

" 'Due process does not impose upon law enforcement "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." ' [Citation.] At most, the state's obligation to preserve evidence extends to 'evidence that might be expected to play a significant role in the suspect's defense.' " (*People v. Duff* (2014) 58 Cal.4th 527, 549.) Whether the loss of evidence rises to the level of a due process violation is governed by the principles set forth by the United States Supreme Court in *California v. Trombetta* (1984) 467 U.S. 479 and *Arizona v. Youngblood* (1988) 488 U.S. 51. (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 771.) Under *Trombetta*, " '[l]aw enforcement agencies must preserve evidence only if [the evidence] possesses exculpatory value [that was] "apparent before [it] was destroyed" ' " and if the evidence is of a type " 'not obtainable "by other reasonably available means." ' " (*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1262; see *Trombetta*, at pp. 488-489.) As an alternative to establishing the apparent exculpatory value of the lost evidence, *Youngblood* provides that a defendant may show that " ' "potentially useful" ' " evidence was destroyed as a result of bad faith. (*Velasco*, at p. 1262; see *Youngblood*, at p. 58.)

We review the trial court's decision on a *Trombetta*/*Youngblood* motion under the substantial evidence standard. (*People v. Duff*, *supra*, 58 Cal.4th at p. 549.)

When ruling on defendant's due process contention, the trial court found the prosecution did not act intentionally to prejudice defendant's case and that much of the lost evidence could be substituted by other evidence that was still available. Defendant

challenges the trial court's finding pertaining to the prosecution's intent by pointing out that the prosecution claimed Christina's murder case was an open case and that disposing of evidence pertaining to an open investigation demonstrates bad faith. This is but one inference. Another inference is that the government disposed of records related to an inactive investigation pursuant to its disposal policies. That was the inference the trial court believed more reasonable, and we conclude substantial evidence supports that inference. Indeed, nothing indicates that an investigation into Christina's death occurred after 1991 and before defendant was charged with Levi's murder. In 1991, the prosecution declined to charge defendant with Christina's murder and requested the investigative agency to conduct further interviews. Because of funding concerns, no further investigation appears to have occurred. Thus, while the prosecution may have argued the investigation into Christina's death was ongoing, the evidence demonstrates an investigation was not being actively pursued and records were disposed of during the normal course of business and after seven years. The length of the retention and uncertainty in defendant's prosecution distinguished this case from the ones relied on by defendant. (Citing *U.S. v. Cooper* (9th Cir. 1993) 983 F.2d 928; *People v. Alvarez*, *supra*, 229 Cal.App.4th 761.) In both of those cases, the government destroyed evidence following a short retention period when it was apparent the defendants were going to be criminally prosecuted. (*Cooper*, at pp. 929-931; *Alvarez*, at p. 777.)

Defendant also points to Investigator Kent's retention of only portions of his report as demonstrating bad faith. There is no indication Investigator Kent saved only the evidence pointing toward guilt, as defendant argues, and he was not asked about the specific items from the report he saved and the reasons for saving those items. Defendant does not argue with specificity about what leads him to the conclusion Investigator Kent acted in bad faith when selecting the records that he chose to save from a voluminous physical file. (Contra *U.S. v. Yevakpor* (N.D.N.Y. 2006) 419 F.Supp.2d 242, 245-250 [bad faith inferred when government saved only three one-minute clips from the

29

defendant's interview and search for the purposes of prosecution].)  Given the lack of evidence pertaining to Investigator Kent's retention of his investigative file, we cannot say the trial court's finding the government acted in good faith is unsupported by substantial evidence.  Accordingly, defendant cannot rely on *Youngblood* and the government's purported ill intent to demonstrate a due process violation.

Defendant does not argue the trial court erred under *Trombetta* in that the government disposed of material exculpatory evidence.  Thus, defendant has failed to demonstrate a due process violation based on lost or disposed of evidence.

II

*Instructional Error Contentions*

Defendant raises several arguments of instructional error, some of which he acknowledges he did not raise at trial.  Because defendant contends the alleged errors affected his substantial rights, we will address the merits of his claims.  (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1315, fn. 43.)

"We review a claim of instructional error de novo.  [Citation.]  ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular instruction.' " '  [Citation.]"  (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.)  " 'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.'  [Citations.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)  "In particular, ' " '[t]he absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.'  [Citation.]" '  [Citation.]  'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' [Citation.]"  (*Fiore*, at p. 1378.)

The trial court is required to instruct on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to

merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Ultimately, we conclude there is no merit to defendant's contentions relying on these standards of review.

A

*The Propensity And Character Evidence Instructions*

*Did Not Lessen The Prosecution's Burden Of Proof*

Defendant argues the character and propensity evidence instructions, permitting the jury to make adverse character and propensity inferences, lowered the prosecution's burden of proof because "it told jurors the [prosecution] only had to prove [defendant's son]'s murder, a charged special circumstance, by a preponderance-of-the-evidence and then [it] could infer [defendant] had a propensity [or scheme] to commit other charged offenses." As support for this contention, defendant relies on our Supreme Court's opinion in *People v. Villatoro* (2012) 54 Cal.4th 1152, and the subsequent appellate opinions of *People v. Cruz* (2016) 2 Cal.App.5th 1178 and *People v. Jones* (2018) 28 Cal.App.5th 316 (*Jones II*).

In *Villatoro*, our Supreme Court held that Evidence Code sections 1108 and 1109 permit consideration of charged offenses to prove a defendant's disposition. (*People v. Villatoro*, *supra*, 54 Cal.4th at pp. 1161-1167.) In the context of uncharged offenses, the jury must find that an offense was committed by a preponderance of the evidence before it may be considered for propensity. (*People v. Carpenter* (1997) 15 Cal.4th 312, 382, superseded by statute on another point as recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.) Our Supreme Court has not yet addressed the question of which standard the jury must apply before considering a charged offense as propensity or disposition evidence.

In *Cruz*, the defendant was convicted of three counts of committing a lewd act against a child under the age of 14 years old. (*People v. Cruz*, *supra*, 2 Cal.App.5th at p. 1180.) The trial court instructed the jury that it could consider charged and uncharged

31

sexual offenses to draw the discretionary inference that the defendant had a propensity to commit sexual offenses. (*Id.* at pp. 1183-1184.) The *Cruz* court held that it was error to instruct the jury it could consider charged offenses to show the defendant's propensity based on a finding the defendant committed the charged offenses by a preponderance of the evidence. (*Id.* at p. 1186.) The *Cruz* court reasoned the instruction "presented the jury with a nearly impossible task of juggling competing standards of proof during different phases of its consideration of the same evidence." (*Id.* at p. 1187.) It concluded, "[T]he ultimate effect is to lower the prosecution's burden of proving guilt beyond a reasonable doubt." (*Ibid.*) The *Cruz* court found the error to be structural and reversed the judgment. (*Ibid.*) In *Jones II*, the appellate court extended the *Cruz* holding to instructions permitting character inferences based on charged offenses under Evidence Code section 1101, subdivision (b), but concluded a harmless error analysis more appropriate than per se reversal. (*Jones II*, *supra*, 28 Cal.App.5th at pp. 325, 328-329.)

The problem with defendant's reliance on *Cruz* and *Jones II* is that the jury here was not instructed it could use a charged offense (or special circumstance, as the case may be) to show defendant's propensity or common scheme. Defendant's charged special circumstance was not that he killed Levi, but that he had been *convicted* of killing Levi. In contrast to *Cruz*, where the jury was encouraged to consider the same facts under different standards of proof to either demonstrate propensity or to prove a charged but not proven offense (*People v. Cruz*, *supra*, 2 Cal.App.5th at pp. 1186-1187), the jury here did not consider the same facts to determine propensity and also the truth of an allegation. Defendant's conviction of Levi's murder, i.e., the special circumstance, was proven by a certificate of conviction and by the contents of defendant's plea agreement. His propensity and common scheme were shown by witness testimony and his own statements related to his domestic violence against Levi and murder of Levi for financial gain. Thus, the instructional error detailed in *Cruz* and *Jones II* did not occur here.

B

*The Propensity Instruction Accurately Instructed The Jury*

*Pursuant To The Trial Court's Evidentiary Rulings*

Defendant contends that, even though the jury could have considered acts of domestic violence against Levi as propensity evidence, the jury was limited to considering for that purpose only the acts that occurred within the five years before Christina's death. (Citing Evid. Code, § 1109, subd. (d)(3).) Defendant does not challenge the trial court's evidentiary ruling, and instead argues the trial court erred by instructing the jury that it could consider acts of domestic violence against his son that occurred outside the five-year window predating Christina's death. We will review defendant's contention to the extent he argues the jury was permitted to consider only the acts occurring five years before the charged offense as a *matter of law*, and that any instruction permitting otherwise was a misstatement of the law. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1015 ["when [a trial court] choose[s] to instruct, it must do so correctly"]). We decline to revisit the trial court's discretionary decision, especially here where defendant insists that he is not requesting us to do so.

Evidence Code section 1109 permits proof of a defendant's character in the form of evidence of a defendant's commission "of other domestic violence." (Evid. Code, § 1109, subd. (a)(1).) Among other things, the statute provides: " 'Domestic violence' " has the meaning set forth in [s]ection 13700 of the Penal Code. Subject to a hearing conducted pursuant to [Evidence Code] [s]ection 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in [s]ection 6211 of the Family Code, if the act occurred no more than five years before the charged offense. [¶] (e) Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." (Evid. Code, § 1109, subds. (d)(3) & (e).)

33

The parties appear to agree defendant's domestic violence against Levi fell under the Family Code's definition of domestic violence and that the acts did not occur within five years before Christina's death. Defendant argues the jury was precluded from considering the abuse. The People counter that, while the statute limits an offense's admission when it occurred before the charged crime, the statute does not include a similar limitation when the offense occurred after the charged crime, and thus the evidence's admission was left to the sound discretion of the trial court. We agree with the People.

From a statutory construction standpoint, Evidence Code section 1109 includes the definition of domestic violence under the Family Code with a five-year limitation, and the definition of domestic violence under the Penal Code with a ten-year limitation. (Evid. Code, § 1109, subds. (d)(3) & (e).) Both limitations guard against the use of remote conduct. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 534 ["Remote prior conduct is, at least theoretically, less probative of propensity than more recent misconduct. [Citation.] This is especially true if the defendant has led a substantially blameless life in the interim"].) Evidence Code section 1109 does not by its terms limit the admissibility of conduct occurring after the charged crime, except through the application of Evidence Code section 352. (Evid. Code, § 1109, subd. (a)(1).) Further, the policy behind Evidence Code section 1109 supports a conclusion that acts occurring after the commission of a charged crime are admissible. To be sure, conduct is not remote if it occurs within a reasonable time period after the charged offense, just like it is not remote if it occurs within a reasonable time period before the charged offense.

Indeed, the purpose of Evidence Code section 1109 is to give probative value to a specific pattern of behavior. "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency

34

and severity.  Without the propensity inference, the escalating nature of domestic violence is likewise masked.  If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner.  Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995-1996 Reg. Sess.) as amended May 14, 1996, at pp. 3-4.)  By enacting Evidence Code section 1109, the intention of the Legislature was to provide a mechanism for allowing evidence of domestic violence to be used by a jury to prove that the defendant committed a charged offense of the same type; recidivist conduct the Legislature has determined is probative because of its repetitive nature.  This would include subsequent acts of domestic violence occurring within a reasonable time of the charged offense.  (See *People v. Cordova* (2015) 62 Cal.4th 104, 133 [upholding the admission of subsequent acts of sexual violence under Evid. Code, § 1108 because "evidence of subsequent crimes may bear on a defendant's character at the time of the charged offense"].)  Ultimately, the admission of subsequent acts is not prohibited by the text of Evidence Code section 1109 and the purpose of the statute supports the admission of evidence establishing a pattern of domestic violence, subject to an analysis under Evidence Code section 352.

Thus, defendant has not demonstrated the jury was prohibited as a matter of law from considering defendant's acts of domestic violence perpetrated after Christina's death.  Accordingly, the question was put to the sound discretion of the trial court. Defendant *does not challenge* that discretionary decision on appeal.  Thus, defendant has failed to prove error.

## C

*The Trial Court Accurately Instructed The Jury With CALCRIM No. 375*

Defendant contends the trial court erred when instructing the jury it "could use evidence that [defendant] 'fraudulently collected insurance proceeds following a 1986 car fire [and] a 2002 barn fire" as character evidence when deciding whether he: "1) 'acted with the intent to collect insurance proceeds in this case'; 2) 'had a motive to commit the offense alleged in this case'; 3) to show his 'alleged actions were not the result of mistake or accident'; or 4) to show he 'had a plan or scheme to commit the offense alleged in this case.' "

Defendant first argues that the trial court's characterization of the car and barn fires as defendant having " 'fraudulently collected insurance proceeds' " was not supported by a preponderance of the evidence establishing defendant caused the fires, and thus fraudulently collected insurance proceeds. That is not a claim that the trial court misstated the law when instructing the jury, but is instead a claim that the trial court admitted evidence for the wrong purpose, e.g., as character evidence. Indeed, in his argument defendant cites to only admissibility of evidence cases and summarily concludes the cases are applicable because evidence he committed insurance fraud with the car and barn fires was speculative. (Citing *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1151-1152 [because the actus reus of the prior act was in dispute, it was an abuse of discretion to admit the prior act as character evidence under Evid. Code, § 1101, subd. (b)]; *People v. Albertson* (1944) 23 Cal.2d 550, 580-581 [suspicious prior conduct cannot be admitted to bolster a theory that because the defendant likely committed the charged crime and also likely committed the prior crime, he *must have* committed the charged crime].) We will not revisit the trial court's discretionary decision to admit the testimony pertaining to the car and barn fires as character evidence because defendant *does not challenge* that ruling. (See *Imagistics Internat., Inc. v. Department of General*

36

*Services* (2007) 150 Cal.App.4th 581, 593, fn. 10 [we need not, and do not, respond to " 'lurking' " or tangential arguments not clearly presented under a heading].)

Properly construed as an instructional error claim, it appears defendant argues that the wording of the jury instruction was argumentative. A jury instruction is impermissibly argumentative if "it would invite the jury to draw inferences favorable to [one party] from specified items of evidence on a disputed question of fact." (*People v. Wright* (1988) 45 Cal.3d 1126, 1135.) Instead, a proper instruction " 'should contain a principle of law applicable to the case, expressed in plain language, indicating no opinion of the court as to any fact in issue.' " (*Ibid.*) We disagree that the instruction was argumentative.

The instruction did not tell the jury that defendant fraudulently collected insurance proceeds from the car and barn fires, but instead informed the jury that *the prosecution presented evidence* that defendant fraudulently collected insurance proceeds and it was up to the jury to first decide by a preponderance of the evidence whether defendant in fact fraudulently collected insurance proceeds.[4] A reasonable jury would have interpreted the

---

[4]     The entire instruction provided:  "The [prosecution] ha[s] presented evidence that the defendant fraudulently collected insurance proceeds following a 1986 car fire, a 2002 barn fire, and the 2008 murder of Levi . . . .  You may consider this evidence only if the [prosecution] ha[s] proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts.  [¶]  Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt.  A fact is proved by the preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  If the [prosecution] ha[s] not met this burden, you must disregard this evidence entirely.  [¶]  If you decide that the defendant committed the uncharged acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether . . . A, the defendant acted with an intent to collect insurance proceeds in this case; B, the defendant had a motive to commit the offense charged in this case; C, the defendant's alleged actions were not the result of [a] mistake or accident; or D, the defendant had a plan or scheme to commit the offense charged in this case.  [¶]  In evaluating this evidence consider the testimony or lack of similarity between the uncharged acts and the charged crime.  Do not conclude from this evidence that the defendant had a bad

37

jury instruction to require it to first assess the evidence to determine whether it showed defendant more likely than not started the car and barn fires, and thus fraudulently collected insurance proceeds, before using the evidence as character evidence. We presume the jury followed those instructions. (*People v. Fiore*, *supra*, 227 Cal.App.4th at p. 1378.)

Even if the car and barn fires were properly considered by the jury, defendant argues it was a misstatement of law to instruct the jury that it could consider the evidence to prove he committed the " 'offense[s] alleged in this case,' " i.e., Christina's murder for financial gain. Defendant contends the instruction should have charged the jury to use the evidence for the limited purpose of determining only whether he started a fire for financial gain. We are not persuaded. In the context of defendant's case pertaining to Christina, the financial gain could only be accomplished by the murder of Christina and receipt of her life insurance proceeds. The record does not reflect that defendant received any other financial benefit from the house fire. Thus, defendant's reliance on cases prohibiting the use of prior felonies to show a motive or plan to commit murder is misplaced. (*People v. Williams* (1988) 44 Cal.3d 883, 908-909 [evidence of the defendant's drug use before a theft was inadmissible under Evid. Code, § 352 to show his drug use before a murder did not affect his capacity]; *People v. Lewis* (2001) 25 Cal.4th 610, 635-637 [evidence of the defendant's prior robbery was admissible to show the defendant's intent to take money by force during a similar robbery as long as the trial court instructed the jury it could not use the evidence "to prove [the] defendant was a person of bad character or that he had a disposition to commit crime"].) In the context of

---

character or was disposed to commit the crime. If you conclude that the defendant committed the uncharged acts, that conclusion is only one factor to consider, along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or that the special allegation or murder for financial gain has been proved. The [prosecution] still must prove each charge and allegation beyond a reasonable doubt."

felony murder, the intent to commit the felony is different than the intent required to commit the murder. Here, the intent to receive financial gain was the intent the prosecution alleged defendant held during the prior fires and during his murder of Christina. Accordingly, the instruction properly explained the purpose for which evidence of the car and barn fires could be used.

D

*No Harm Resulted From The Trial Court's Failure To Instruct The*

*Jury On The Lesser Included Offense Of Involuntary Manslaughter*

Defendant contends the trial court had a duty to sua sponte instruct the jury with the lesser included offense of involuntary manslaughter based on criminal negligence and that he was prejudiced by the court's failure to do so. We disagree.

As stated, the trial court is required to instruct on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v Breverman*, *supra*, 19 Cal.4th at p. 162.) However, "the existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense." (*Ibid.*, italics omitted.) The court is not required to instruct on theories that are not supported by substantial evidence. (*Ibid.*) " ' "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*People v. Romero* (2008) 44 Cal.4th 386, 403.)

Unlawfully causing a fire (§ 452) is a lesser included offense of arson (§ 451; *People v. Atkins* (2001) 25 Cal.4th 76, 88; *People v. Hooper* (1986) 181 Cal.App.3d 1174, 1182, disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 189, fn. 7). "A person is guilty of unlawfully causing a fire when he recklessly sets fire to or burns or causes to be burned, any structure, forest land or property." (§ 452.) In the chapter of the Penal Code addressing arson, " '[r]ecklessly' " means, in pertinent part, that "a person is aware of and consciously disregards a substantial and unjustifiable risk

39

that his or her act will set fire to, burn, or cause to burn a structure, forest land, or property. The risk shall be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." (§ 450, subd. (f).)

"[T]he offense of unlawfully causing a fire covers reckless accidents or unintentional fires, which, by definition, is committed by a person who is 'aware of and consciously disregards a substantial and unjustifiable risk that his or her act will set fire to, burn, or cause to burn a structure, forest land, or property.' [Citations.] For example, such reckless accidents or unintentional fires may include those caused by a person who recklessly lights a match near highly combustible materials." (*People v. Atkins*, *supra*, 25 Cal.4th at p. 89.)

Defendant argues his theory of the case—that the fire was an accident caused by the utility light—supported an instruction of involuntary manslaughter based on the theory he recklessly started a fire. He points to the prosecutor's closing argument describing an accidental fire started by such means as constituting implied malice murder, and argues the inference likewise supported an instruction on involuntary manslaughter. We do not need to address defendant's contention because we do not discern any resulting prejudice. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165 [failure to instruct on a lesser included offense instruction is an error under state law]; see *id.* at p. 178 [we review state law error to determine whether it was " 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred"].)

According to defendant's own argument, the jury was told the precise factual theory of guilt he argues would have supported an involuntary manslaughter instruction actually supported an implied malice murder verdict. Instead of convicting defendant of implied malice murder, the jury rejected the facts supporting that legal theory and found him guilty of the greater offense of *express malice* murder. If the jury had been

40

instructed on an involuntary manslaughter theory, it is certain it would have rejected that theory as well because it already rejected the facts supporting it. (See *People v. Wang* (2020) 46 Cal.App.5th 1055, 1072 [" 'It is well established that "[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions." ' "].) Accordingly, any alleged error was harmless.

## III

### *Evidentiary Error Contentions*

Defendant raises two evidentiary contentions pertaining to his many statements to investigators over the years. First, he argues the trial court abused its discretion under Evidence Code section 352 by admitting the entire interview between himself and investigators in New York. And second, defendant argues his counsel was ineffective for failing to object to the admission of the interviews between himself and Investigator Kent, the New York investigators, District Attorney Investigator Whitney, and the investigator of the barn fire because much of the interviews contained hearsay statements and many of defendant's statements were not inconsistent. We will address defendant's second contention on the merits, instead of through the ineffective assistance of counsel lens, because we ultimately conclude the contention lacks merit and an attorney is not ineffective for failing to bring a meritless objection. (*People v. Lucero* (2000) 23 Cal.4th 692, 732.) Accordingly, we review the trial court's admission of defendant's various interviews with investigators for an abuse of discretion. (*People v. Flores* (2020) 9 Cal.5th 371, 409.)

### A

### *Background*

As described, defendant gave many statements to investigators over the years. The first of defendant's challenged interviews occurred between himself and Investigator

41

Kent a little over a month after the fire when defendant called Investigator Kent to ask about the status of the investigation. During the phone call, defendant explained the decision to obtain life insurance for himself and Christina, the events of the kerosene spill and broken window, and the presence of numerous boxes in the hallway. He also recounted the events of the day of the fire, his rescuing of his children, and his failings in rescuing Christina. He further guessed at the possible causes of the fire and the reason why the smoke detector did not function during the fire. Defendant ended the conversation by telling Investigator Kent he hoped for a quick resolution to his insurance claim. The interview was relatively short and minimally diverted from the topic of the fire investigation.

The next interview defendant challenges is his interview with the insurance investigator who investigated the barn fire. That interview was short, lasting approximately 11 minutes in total. Defendant told the insurance investigator that three of his horses died in the fire and that the horses were separately insured from the barn. Defendant also told the investigator that just prior to the fire he had increased the amount of the insurance policy for the barn and removed coverage for his grain bins from the policy. Defendant told the insurance investigator his father had upgraded the wiring in half of the barn, but the other half had not been upgraded from the old wiring.

Defendant was also interviewed by investigators in New York about Levi's death. This interview was nine and a half hours long, and eight and a half hours of it was played for the jury. At the beginning of the interview, and several instances throughout, defendant denied telling the truth when he told his then-wife that he had killed Levi. Defendant admitted to being present in the house on the day Levi died, but only admitted that he found Levi after he had returned from a funeral after 4:00 p.m. Defendant denied killing Levi.

Much of the interview consisted of investigators urging defendant to not lie to them and to tell the truth about what happened the day of Levi's death. They did this

42

through several interrogation techniques. The investigators sympathized with defendant over the difficulty of raising a son with so many behavioral issues and over defendant's many health challenges.

Investigators confronted defendant about Levi's insurance policy and defendant's role in Levi obtaining a life insurance policy. Defendant said it was Levi's idea to take out the policy, but that defendant had made the first payment because Levi did not have the money at the time. Defendant explained why he was the beneficiary of the life insurance policy and said most, if not all, of the money had been spent instead of defendant administering it for Levi's daughters' benefit.

Defendant continued to deny having killed Levi, claiming that at the time of Levi's death, defendant was taking a lot of medication and physically incapable of killing his son. Defendant again went over his conduct the day of Levi's death and the reasons Levi took out a life insurance policy naming defendant as the beneficiary.

Defendant spoke about Levi's previous house that burned down after defendant had done some work on it. He also talked about his own business raising horses and the barn fire in 2002 that killed four horses. Defendant then talked to the investigators extensively about his time in the military and how he met Christina and then moved to Calaveras County. Defendant also described the circumstances of the house fire that killed Christina, including the kerosene spill and boarded bathroom window. Defendant told the New York investigators that Christina got life insurance several months before her death. Defendant also claimed that nobody had ever been suspicious of him or accused him of killing Christina.

The New York investigators then told defendant that the timing of Levi's death corresponded with the time defendant was at the house and had not yet left for the funeral he attended that day. Following this assertion, defendant admitted to checking on Levi before leaving for the funeral and seeing the truck had fallen on him and he was dead.

43

Instead of calling for help, according to defendant, he was in shock and left Levi under the truck until he returned from the funeral nearly four hours later.

When the investigators asked whether he had killed Christina, defendant denied killing her, stating Christina was the perfect wife and that they were happy in their marriage. Defendant acknowledged that Levi had been difficult as a child and teenager but claimed Levi had turned his life around and there was no anger between them. As an explanation for his conduct when he discovered Levi's body trapped under a truck, defendant pointed to the fact that he had been taking a lot of painkillers at the time and was not thinking clearly.

At this point, a new investigator came into the room to talk with defendant. He claimed to be investigating a molestation charge against Levi. Defendant said he did not know about allegations of molestation against Levi and then discussed Levi's prior allegations of abuse against defendant. Defendant then extensively discussed Christina's death with the new investigator, including the kerosene spill, boarded bathroom window, Christina's insurance policy, and the lawsuit brought by the owners of the house against him. Defendant then discussed the 2002 barn fire, including the amount he was paid in insurance proceeds, the property he lost, and the changes in the policy in the months before the fire. Further, defendant discussed the 1986 car fire before quickly explaining the origins of a small fire at his workplace. The conversation turned to Levi's house fire before it went back to Levi's behavior and positive prospects in the year before his death.

Defendant described Levi's decision to get life insurance and why he named defendant as the beneficiary. Defendant accounted for how the money from the life insurance was spent by himself and his then-wife. Defendant then again recounted the events of the day of Levi's death, claiming he found Levi after the truck had already fallen on him. In response, the investigator confronted defendant with a statement he made to his then-wife that he had enticed Levi to come to the house to work on the truck. Defendant further told his then-wife he had jacked up the truck on a wobbly jack and

44

pushed the truck on Levi. The investigator also confronted defendant with the inconsistencies in his story about when he boarded up the bathroom window before Christina's death, when the kerosene spill occurred, and when Christina's life insurance policy had been purchased. After the investigator accused defendant of killing Christina and Levi, and defendant repeatedly denied those accusations, defendant admitted to helping Levi fix the truck by climbing inside of it, which caused the truck to fall off of the jack and crush his son who was under it. According to defendant, it was an accident.

The final interview defendant challenges is the interview between himself and District Attorney Investigator Whitney. The interview started with defendant's narrative about the events of the 1991 house fire that killed Christina, including how the kerosene spilled in the house, how the bathroom window became boarded up, and defendant's suspicions about how the fire started. Defendant told District Attorney Investigator Whitney that after the fire, his brother and sister-in-law came to California with the purpose of taking him and his children to New York.

Defendant then discussed his 1986 car fire and his 2002 barn fire. He also described the efforts he undertook to save Christina, stating he wished he had done more. Defendant then detailed the decision to get life insurance for himself, Christina, and the children.

Defendant spent much time discussing Christina's character and his marriage to her. At times, defendant also discussed his horse business, his relationship with his father, and his welding experience. Defendant and District Attorney Investigator Whitney then returned to the topic of the fire and defendant discussed the events after the fire. He said he let others make decisions for him because he was on medication and lost the will to live given Christina's death. He also said that Christina's family had never accused him of killing Christina. Defendant then recounted the events of the fire again, including how the window became boarded up, the kerosene spill, and defendant's suspicions about the origin of the fire.

45

The interview continued with a discussion of defendant's volunteer firefighter experience. District Attorney Investigator Whitney confronted defendant about the inconsistencies in his statements and with State Farm's investigator's findings, ultimately accusing defendant of murdering Christina. Defendant denied the accusation and continued to claim Christina was the perfect wife and that he tried to save her during the fire.

B

*The Trial Court Did Not Abuse Its Discretion Under Evidence Code Section 352*

Defendant contends the trial court abused its discretion under Evidence Code section 352 by not requiring the prosecution to edit defendant's interview with New York investigators. Defendant does not argue the fact he killed Levi was irrelevant or improper character and propensity evidence. Instead, defendant argues the New York interview constituted an undue consumption of time and was cumulative to defendant's admissions at his plea hearing for Levi's murder. He further argues the interview was unduly prejudicial because it contained multiple statements from investigators calling defendant a liar and professing defendant's guilt, while also painting a very sympathetic picture of defendant's son, who was gruesomely murdered.

The People argue defendant forfeited this claim by failing to make a timely and specific objection. We disagree. Defendant made several objections and the issue was thoroughly addressed by the prosecution and the trial court. Thus, we will address the merits of defendant's claim and conclude there was no abuse of discretion.

Evidence is inadmissible under Evidence Code section 352, "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence is unduly prejudicial " 'if it " 'uniquely tends to evoke an emotional bias against a party as an individual[,]' " [citation] or if it would

46

[lead] the jury to " ' "prejudg[e]" a person or cause on the basis of extraneous factors.' " ' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.)

As an initial matter, we note the prosecution played approximately eight and a half hours of the nine-and-a-half-hour interview for the jury. The court did not send the video of the interview into the jury room for the jury to view, waiting instead for the jury to request the video. It does not appear the jury ever requested the video.

We agree with defendant that the interview was long, but contrary to his contention, it was not rife with irrelevant discussion. While true defendant made statements pertaining to his physical health, a fire that destroyed his son's house, and his time in the military, which were not particularly relevant, those statements were brief and, on the whole, defendant's interview progressed from one relevant topic to another.

Defendant talked about his relationship with Levi, which he painted in a much different light than his older daughter painted it—thus relevant to his credibility generally, as well as his pattern of claiming to investigators he had happy relationships with family members in the aftermath of their deaths under suspicious circumstances that financially benefited him. Defendant spoke of the circumstances of taking out the insurance policy with Levi and how Levi's intent was to give the life insurance proceeds to his daughters under defendant's care and direction, but how defendant and his then-wife spent most of the money on their own interests. This was relevant to demonstrate defendant's pattern and scheme to use the death of his family members for financial gain. Defendant spoke of the barn fire and the car fire, which provided most of the evidence regarding these subjects, and thus were not cumulative nor required to be omitted from the interview. Defendant also recounted taking out the life insurance policy on Christina and the fire leading to her death. Defendant's statements pertaining to Christina's death included multiple inconsistencies with his prior statements, thus pointing to the credibility of his statements generally and probative to whether he killed Christina for financial gain.

47

Importantly, the interview was not cumulative to defendant's admissions at the time of his plea to his son's murder. Defendant admitted that he intentionally lured Levi under a truck, made the truck fall on Levi, and then failed to help Levi escape death. Defendant did not admit to these things during his prolonged interview. Instead, with every retelling of the circumstances surrounding Levi's death, defendant's story changed such that he accepted more and more responsibility, while all the while claiming Levi's death was an accident. Thus, defendant's admissions pertaining to Levi's death were not cumulative. His admissions further demonstrated how defendant enacted a plan and scheme to paint Levi's death as an accident for the purpose of financial gain, and the jury could use those admissions to compare them to defendant's admissions during interviews related to Christina's death. Accordingly, the New York interview held significant probative value.

Comparatively, the interview was not unduly prejudicial. To the extent the investigators interviewing defendant voiced their belief defendant was guilty of Levi's and Christina's murders or alluded to evidence outside that presented at trial, those statements were explained during testimony as interview techniques and having been made for the purpose of the interview. Indeed, investigators' questions are generally not offered for the truth, but to provide context to defendant's answers. (See *People v. Maciel* (2013) 57 Cal.4th 482, 524.) We see no undue prejudice in this regard.

Similarly, statements regarding the condition of Levi's body when he was crushed under the truck or statements painting defendant's son in a good light did not serve to pull upon the jury's sympathy such that it would convict defendant of his wife's murder simply given his conduct towards his son. Defendant had already pled guilty to Levi's murder and was being punished for it, and the murder of his son was not more egregious than the murder of Christina. (See *People v. Balcom* (1994) 7 Cal.4th 414, 427 [prejudicial impact of evidence lessened when the defendant had been convicted of the prior bad act because "the jury was not tempted to convict [the] defendant of the charged

48

offenses, regardless of his guilt, in order to assure that he would be punished for the uncharged offenses"].)  Thus, it is unlikely the jury would have let evidence pertaining to Levi's death prejudicially influence its determination of defendant's guilt pertaining to Christina's death.  Accordingly, the trial court did not abuse its discretion under Evidence Code section 352 by admitting the New Yok interview.

C

*Defendant's Interviews Were Not Hearsay*

Defendant contends it was an abuse of discretion for the trial court to admit the New York interview because the interview was hearsay since it did not constitute an inconsistent statement as proffered by the prosecution.  We agree the interview did not constitute an inconsistent statement under Evidence Code sections 770 and 1235, but that was not the only applicable hearsay exception.  The New York interview was a *party admission* (Evid. Code, § 1220), and the reason it was relevant was because it contained detailed adverse evidence against defendant and several inconsistencies with defendant's prior statements regarding Christina's death and with other witnesses' statements regarding defendant's relationships with Christina and Levi.  The New York interview was further relevant for the reasons outlined in the previous subsection, and thus the trial court did not abuse its discretion by admitting the interview, and counsel was not ineffective for failing to object to its admission on hearsay grounds.

Defendant further contends it was an abuse of discretion for the trial court to admit the investigators' statements and questions during his interviews with Investigator Kent, the investigator of the barn fire, and District Attorney Investigator Whitney.  Not so.  The questions posed and statements made by investigators to defendant during these interviews are not hearsay because they were not being offered for their truth, but to give context to defendant's answers.  (See *People v. Maciel*, *supra*, 57 Cal.4th at p. 524.)  Again, the trial court did not abuse its discretion, and counsel was not ineffective for failing to object to various interviews on hearsay grounds.

49

Further, because defendant has not shown a violation of the state rules of evidence, he cannot demonstrate a due process violation. (*Jones I*, *supra*, 57 Cal.4th at p. 957 ["the routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights"].) We accordingly reject defendant's claim in that regard.

## IV

### *There Was No Cumulative Error*

Defendant contends the accumulation of errors he argues on appeal rendered his trial fundamentally unfair. Having presumed a single instance of error, which we determined was harmless, we conclude there was no cumulative error.

## V

### *The Statutory Restitution Fine Must Be Stricken*

Defendant contends the restitution requiring him to pay the value of Christina's life insurance proceeds, plus interest, to the daughters he shared with her must be stricken because the fine does not repay his daughters for any loss that they experienced but disgorges defendant of an economic gain. We disagree.

"Restitution is constitutionally and statutorily mandated in California." (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1045; see Cal. Const., art. I, § 28; § 1202.4.) Section 1202.4, subdivision (f) provides in relevant part: "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim . . . or any other showing to the court." A victim is defined not only as the person targeted by the crime, but the immediate surviving family members of the victim, or a child of the victim, or someone that lived in the household with the victim. (§ 1202.4, subd. (k)(1), (3)(A).)

50

We review a trial court's restitution order for abuse of discretion, which will be found only when there is an absence of a factual and rational basis for it. (*People v. Giordano* (2007) 42 Cal.4th 644, 663-664; *People v. Jessee* (2013) 222 Cal.App.4th 501, 507.) "[A]n order resting on a demonstrable legal error constitutes such an abuse." (*People v. Hume* (2011) 196 Cal.App.4th 990, 995.)

A similar issue was addressed in *Jessee*, wherein the appellate court determined whether a decedent's estate could be awarded restitution from the defendant/wife who received the decedent's life insurance proceeds after killing him. (*People v. Jessee*, *supra*, 222 Cal.App.4th at pp. 507-509.)

The *Jessee* court answered in the affirmative, reasoning that "[t]he logic is quite simple. [The wife] was convicted of conspiracy to commit murder and special-circumstance first degree murder for financial gain. There is no doubt one immediate object of those crimes was the life insurance and other assets which were owned by [the decedent], and which became part of [the decedent]'s estate as a result of his death. So in this sense, [the decedent]'s estate itself is an entity against which those crimes were committed. Under these circumstances, we conclude [the decedent]'s estate is entitled to restitution, on its own behalf, as an entity itself directly targeted and victimized by [the wife]'s crimes." (*People v. Jessee*, *supra*, 222 Cal.App.4th at p. 509.)

Here too the jury found defendant killed Christina for financial gain, and thus deprived her estate of the life insurance money that he was not entitled to collect. (See Prob. Code, §§ 250-252.) That money rightfully belonged to Christina's heirs as beneficiaries of Christina's estate as was testified to by the State Farm agent who investigated defendant's case. (See Prob. Code, § 252.) Further, Christina's heirs are victims entitled to restitution for their loss. (Pen. Code, § 1202.4, subd. (k)(1), (3)(A).)

Still, defendant contends his daughters did not suffer an economic loss consisting of the insurance proceeds because he used the proceeds to pay for their life in New York following Christina's death. We are not persuaded. Defendant's daughters made victim

impact statements detailing the life they lived with defendant after their mother's death. Both daughters indicated defendant did not financially support them and made them work around the house and on their farm to earn their place in the home. These statements support the trial court's finding that defendant's daughters suffered economic loss because of defendant receiving Christina's insurance proceeds. Thus, the trial court did not err by imposing direct victim restitution to defendant's daughters in the amount of Christina's life insurance policy.

Given this outcome, defendant further contends that, because the trial court imposed direct victim restitution exceeding $200,000, his statutory restitution fine of $10,000 must be stricken pursuant to the law in effect at the time he committed the crime. The People concede the point, and we accept their concession. "It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions." (*People v. Souza* (2012) 54 Cal.4th 90, 143.) "Former [Penal Code] section 1202.4 and Government Code former section 13967 required setting a restitution fine of between $200 and $10,000, but additionally provided that in a case in which a victim has suffered an economic loss as a result of a defendant's conduct, a court may order that restitution be paid directly to the victim in the amount of the losses, 'in lieu of imposing all or a portion of the restitution fine.' " (*Ibid.*) Thus, defendant's judgment must be modified by striking the $10,000 statutory restitution fine imposed under Penal Code section 1202.4, subdivision (b).

Finally, as it pertains to defendant's restitution, the trial court ordered defendant to pay 10 percent interest on the amount of Christina's life insurance proceeds from the date defendant received the insurance money. The abstract of judgment reflects that day to be February 1, 1992. The parties disagree about when defendant received the life insurance check—defendant contends the check was paid to him on January 31, 1993, and the People contend the check was dated January 31, 1992. Indeed, both parties cite to a State

Farm representative who testified the check was issued to defendant on January 31, 1993, but it may have been 1992. The State Farm representative, however, went on to explain he saw that the check was paid in 1992 pursuant to the investigation timeline that he reviewed. Thus, it is reasonable to infer that defendant received the check the day after State Farm issued it on January 31, 1992. Accordingly, the record supports the abstract of judgment's notation that defendant received the insurance proceeds from Christina's life insurance policy on February 1, 1992.

                                          DISPOSITION

      The judgment is modified to strike the $10,000 restitution fine imposed under section 1202.4, subdivision (b). The judgment is affirmed as modified. The trial court shall forward a corrected abstract of judgment to the Department of Corrections and Rehabilitation.


                                          /s/
                                          ROBIE, Acting P. J.


We concur:


/s/
DUARTE, J.


/s/
MESIWALA, J.